# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW JERSEY, STATE OF NEW YORK, and STATE OF CONNECTICUT,<br><br>    Plaintiffs,<br><br>    v.<br><br>STEVEN T. MNUCHIN, *in his official capacity as Secretary of the United States Department of the Treasury*; CHARLES P. RETTIG, *in his official capacity as Commissioner of the Internal Revenue Service*; UNITED STATES DEPARTMENT OF THE TREASURY; and INTERNAL REVENUE SERVICE,<br><br>    Defendants. | **No. 1:19-cv-06642** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The State of New Jersey, the State of New York, and the State of Connecticut (collectively "Plaintiff States") hereby file this Complaint seeking declaratory and injunctive relief against Steven T. Mnuchin, in his official capacity as Secretary of the Treasury; Charles P. Rettig, in his official capacity as Commissioner of the Internal Revenue Service; the United States Department of the Treasury; and the Internal Revenue Service (collectively, "Defendants") and, in support thereof, state the following:

1.    This lawsuit challenges an IRS final rule that undermines state and local programs designed to promote charitable giving through the use of state and local tax ("SALT") credits.

2.    To encourage charitable giving and provide relief to taxpayers, the majority of states, including the Plaintiff States, have developed programs that offer tax credits to taxpayers who make contributions to qualifying institutions. More than 100 such programs exist in 33 states, incentivizing individuals to donate to causes ranging from natural resource preservation and aid

for higher education to domestic violence shelters. These diverse programs encourage charitable giving and citizen engagement, ensure the financial viability of philanthropic organizations, relieve the burdens on state and local governments, and promote a vibrant civil society.

3.      Until recently, the IRS has treated charitable contributions made pursuant to these programs as fully deductible under Section 170 of the Internal Revenue Code (the "Code"). *See* IRS Chief Counsel Advisory 201105010 (Oct. 27, 2010) ("2010 CCA"). Indeed, Congress enacted the federal charitable deduction in 1917. Since that time, taxpayers have always been permitted to deduct the full value of their charitable contributions, regardless of the amount of any tax benefits received as a result of the donation.

4.      Such treatment accords with a long line of case law and IRS rulings holding that the receipt of tax benefits does not diminish the donor's charitable intent or the donor's right to claim a full federal charitable deduction for a contribution. *See Transamerica Corp. v. United States*, 15 Cl. Ct. 420, 465 (1988) (stating that "[e]ven where the donation is made solely for the purpose of obtaining a tax benefit, the taxpayer is entitled to the deduction"); *Skripak v. Comm'r*, 84 T.C. 285, 319 (1985) (noting that "a taxpayer's desire to avoid or eliminate taxes … cannot be used as a basis for disallowing the deduction for that charitable contribution").

5.      On June 13, 2019, the IRS issued a final rule that represents a radical break with this historical precedent and practice. *See* Contributions in Exchange for State or Local Tax Credits, 84 Fed. Reg. 27513 (June 13, 2019) ("Final Rule").

6.      The IRS's Final Rule will—for the first time—require taxpayers to subtract the value of state or local tax credits from their federal charitable deduction.

7.      The Final Rule is unlawful under the Administrative Procedure Act ("APA") because it is inconsistent with the plain meaning of Section 170, and it is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law"; and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). The Final Rule violates the APA because:

a.   Contrary to Section 170, it treats a SALT credit as a *quid pro quo* when received in return for making a charitable contribution, such that the contribution no longer qualifies for a full federal charitable deduction;

b.   Contrary to Section 170, and in an arbitrary and capricious manner, it treats a donor's receipt of tax benefits in the form of credits—but not tax benefits in the form of deductions—as diminishing the taxpayer's charitable intent;

c.   Contrary to Section 170, and in an arbitrary and capricious manner, it treats a donor's receipt of tax credits worth more than 15 percent of the underlying donation—but not tax credits worth 15 percent or less of the underlying donation—as diminishing the taxpayer's charitable intent; and

d.   Contrary to Section 170, and in an arbitrary and capricious manner, it considers impermissible factors in justifying its interpretation, ignores other relevant factors, and repeatedly mischaracterizes the impacts of the Final Rule.

8.   The Final Rule also violates the Regulatory Flexibility Act, 5 U.S.C. § 601, *et seq.* Despite the Final Rule's "significant economic impact" on "small governmental jurisdiction[s]" in the Plaintiff States, the IRS failed to publish an initial and a final regulatory flexibility analysis, as required by the Act. *See* 5 U.S.C. §§ 601(5)-(6), 603(a), 604(a), 605(b).

9.   To protect state charitable donation programs from Defendants' unlawful actions, the Plaintiff States seek declaratory and injunctive relief vacating or setting aside the Final Rule and enjoining its implementation.

## JURISDICTION AND VENUE

10.   This Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

11.     Venue is proper in this Court because the Plaintiff State of New York resides in this district and because a substantial part of the events giving rise to this action occurred in this district. *See* 28 U.S.C. § 1391(e)(1)(B)–(C).

12.     This action arises under the APA, 5 U.S.C. §§ 553, 701–06. Under these provisions, this Court has the authority to issue the injunctive relief that the Plaintiff States seek.

13.     Furthermore, under 28 U.S.C. § 2201, this Court has the authority to issue the declaratory relief that the Plaintiff States seek.

14.     Other than an action in this Court, the Plaintiff States have no alternative means by which they may challenge the Final Rule.

## THE PARTIES

15.     Plaintiff State of New Jersey, represented by and through its Attorney General, is a sovereign state of the United States of America. Attorney General Gurbir S. Grewal is the chief legal officer of the State of New Jersey and is authorized to pursue this action under N.J. Stat. Ann. § 52:17A-4(e), (g).

16.     Plaintiff State of New York, represented by and through its Attorney General, is a sovereign state of the United States. Attorney General Letitia James is the chief legal officer of the State of New York and brings this action under N.Y. Executive Law § 63(1) at the request of Governor Andrew M. Cuomo.

17.     Plaintiff State of Connecticut, represented by and through its Attorney General, is a sovereign state of the United States. Attorney General William Tong is the chief legal officer of the State of Connecticut and is authorized to pursue this action under Conn. Gen. Stat. § 3-125.

18.     Defendant Steven T. Mnuchin is the Secretary of the United States Department of the Treasury. He is sued in his official capacity. His principal address is 1500 Pennsylvania Avenue NW, Washington DC 20220.

19.     Defendant Charles P. Rettig is the Commissioner of the Internal Revenue Service. He is sued in his official capacity. His principal address is 1111 Constitution Avenue NW, Washington DC 20224.

20.     Defendant the United States Department of the Treasury is an executive agency of the United States. Its principal address is 1500 Pennsylvania Avenue NW, Washington DC 20210.

21.     Defendant the Internal Revenue Service ("IRS") is a component of the United States Department of the Treasury. Its principal address is 1111 Constitution Avenue NW, Washington DC 20224.

22.     Defendants Mnuchin and Rettig are responsible for carrying out the duties of the Department of the Treasury and the IRS under the relevant statutes.

## BACKGROUND

23.     Historically, Congress has provided a federal individual income tax deduction for state and local taxes, including an unrestricted deduction for all state and local income and property taxes (the "SALT deduction").

24.     On December 22, 2017, Congress made a radical break with that precedent, capping the SALT deduction at $10,000 for individuals and married taxpayers filing jointly, and at $5,000 for married taxpayers filing separately. *See* An Act to Provide for Reconciliation Pursuant to Titles II and V for the Concurrent Resolution on the Budget for Fiscal Year 2018, Pub. L. No. 115-97, § 11042, 131 Stat. 2054 (2017) (the "Act").

25.     Proponents of the cap were clear about their objectives. According to Secretary Mnuchin, the cap would "send a message" to states with generous social welfare programs that their tax and spending policies would need to conform to those of the administration and the Republican Congress. *See* Ramesh Ponnoru, *Red States, Blue States, and Taxes*, Nat'l Rev., Nov.

8, 2017, *at* http://www.nationalreview.com/corner/453535/red-states-blue-states-and-taxes (last visited July 14, 2019). President Trump made clear that the intent of the cap was to force a dilemma on the Plaintiff States: change their tax and spending policies, or they were "not going to benefit" from the Act. *See* Transcript: President Trump Vows Largest Tax Cut in the History of This Country, Hannity (Oct. 11, 2017), *at* http://www.foxnews.com/transcript/2017/10/11/president-trump-vows-largest-tax-cut-in-history-this-country.html (last visited July 14, 2019).

26.     Among other things, one of the effects of the new cap on the SALT deduction is to make state and local taxes more expensive. It does this by increasing the tax liability on the income that individuals pay toward their state and local taxes.

27.     The SALT cap disproportionately harms taxpayers in the Plaintiff States, and it harms the Plaintiff States directly. The cap puts pressure on the Plaintiff States in a number of ways—making it more difficult as a practical matter for them to impose state taxes; by depressing home equity value; by reducing state tax revenue; and more.

28.     To ease the burden on their taxpayers, the Plaintiff States amended their respective tax laws to enable taxpayers to make contributions to state- or locality-affiliated charitable funds in return for state or local tax credits. Under the programs, taxpayers receive a state or local tax credit for their contributions, thereby reducing their state tax liability. Under longstanding judicial and IRS precedent, taxpayers may also deduct charitable contributions made pursuant to these programs in full from their federal individual income taxes. Furthermore, because the programs do not provide dollar-for-dollar tax credits, they generate a net increase in revenue for state and local governments.

29.     For years, states have maintained similar charitable tax credit programs. At least 33 states have created more than 100 such programs, and the IRS has always permitted taxpayers to claim the full federal charitable deduction for donations made pursuant to these programs.

30.     Yet, despite having allowed such deductions for years, the IRS acted quickly to stymie the Plaintiff States' efforts to protect their taxpayers.

### THE FINAL RULE

31.     Section 170 of the Code permits taxpayers to deduct from their taxable income "any charitable contribution … made within the taxable year." 26 U.S.C. § 170(a).

32.     Section 170 defines "charitable contribution" as a "contribution or gift to or for the use of" qualifying governmental or charitable institutions. *Id.* § 170(c).

33.     To claim a charitable deduction under Section 170, a taxpayer must have acted with charitable intent. *Scheidelman v. Commissioner*, 682 F.3d 189, 199 (2d Cir. 2012).

34.     Prior to the publication of the Final Rule, case law and IRS administrative guidance uniformly held that the expectation of a tax benefit does not give rise to a *quid pro quo* that would negate charitable intent or reduce the amount of a charitable deduction under Section 170.

35.     Indeed, courts and the IRS have long treated tax benefits as a simple reduction in tax liability—and not as consideration reflecting a bargained-for exchange. *See, e.g.*, *Browning v. Comm'r.*, 109 T.C. 303, 325 (1997) (rejecting as "untenable" the argument that a taxpayer "may be entitled to a charitable contribution deduction of some lesser amount on account of the economic value of the deduction"); *McLennan v. United States*, 24 Cl. Ct. 102, 106 n.8 (1991) (noting that "a donation … for the exclusive purpose of receiving a tax deduction does not vitiate the charitable nature of the contribution"), *aff'd* 994 F.2d 839 (Fed. Cir. 1993); *Transamerica Corp. v. United States*, 15 Cl. Ct. 420, 465 (1988) (stating that "[e]ven where the donation is made solely for the purpose of obtaining a tax benefit, the taxpayer is entitled to the deduction"); *Skripak*

*v. Comm'r*, 84 T.C. 285, 319 (1985) (finding that "a taxpayer's desire to avoid or eliminate taxes … cannot be used as a basis for disallowing the deduction for that charitable contribution").

36.     Furthermore, case law and IRS rulings have unanimously held that tax benefits do not constitute "income" under Section 61 of the Code. *See, e.g.*, *Randall v. Loftsgaarden*, 478 U.S. 647, 657 (1986) (stating that "[t]he 'receipt' of tax deductions or credits is not itself a taxable event, for the [taxpayer] has received no money or other 'income' within the meaning of the Internal Revenue Code"); Rev. Rul. 79-315, 1979-2 C.B. 27, at 2 (holding that tax rebate was not "includible in the individual's gross income"). If tax credits do not represent a thing of value for purposes of calculating gross income under Section 61 of the Code, it is logical to infer that they cannot be treated as a "return benefit" giving rise to a *quid pro quo* under Section 170.

37.     Consistent with these precedents, on February 4, 2011, the IRS's Office of Chief Counsel released a memorandum advising taxpayers that they could deduct the full amount of their charitable contributions under Section 170 without subtracting the value of SALT credits. *See* 2010 CCA. After noting that "[t]he tax benefit of a federal or state charitable contribution deduction is not regarded as a return benefit that negates charitable intent," the Chief Counsel concluded that there was "no reason to distinguish the value of a state tax deduction, and the value of a state tax credit, or to draw a bright-line distinction based on the amount of the tax benefit in question." *Id.* at 4-5.

38.     In *Tempel v. Commissioner*, the Tax Court endorsed this approach, specifically rejecting the contrary view that "a State's grant of State income tax credits to taxpayers who make charitable donations … should be treated as a transaction that is in part a sale and in part a gift." 136 T.C. 341, 351 n.17 (2011). Noting that "[t]he Commissioner has eschewed this approach," the court "discern[ed] no reason to disturb this practice." *Id.*

39.     The unbroken precedent permitting a full deduction for charitable contributions that entitle a donor to tax benefits accords with the meaning and intent of Section 170.

40.     Relying on this consistent interpretation of Section 170, at least 33 states have developed charitable contributions programs, similar to those recently enacted by the Plaintiff States, that provide a state or local tax benefit in return for a charitable contribution to a qualifying entity under Section 170(c).

41.     These programs are consistent with the purpose of Section 170, which is to encourage charitable giving through the provision of tax benefits, and the text of that provision provides no basis for a rule requiring taxpayers to subtract the value of state and local tax benefits from their federal charitable deduction.

42.     Had Congress wished to eliminate the deductibility of charitable contributions when taxpayers receive state or local tax credits—upending decades of practice and adversely affecting programs in at least 33 states—it would have done so in clear terms. Yet, despite this consistent body of IRS statements, judicial decisions, and practice, Congress has not added any such limitation to Section 170—even as it has undertaken numerous tax law overhauls since the establishment of the charitable deduction in 1917.

43.     During the most recent federal tax overhaul in 2017, Congressional sponsors of the legislation repeatedly stressed that the charitable deduction would remain intact.

44.     As House Speaker Paul Ryan explained: "[T]he Tax Cuts & Jobs Act preserves the deduction for charitable giving." Speaker Paul Ryan, Twitter, Nov. 28, 2017, 8:01AM, https://twitter.com/SpeakerRyan/status/935539184437260288.

45.     House Ways & Means Committee Chairman Kevin Brady (R-Tex.) likewise stressed: "Preserving and expanding the charitable deduction will continue to encourage and

reward Americans who give back to their local church, charity, or other cause they believe in."
Chairman Kevin Brady, Twitter, Dec. 25, 2017, 11:30AM,
https://twitter.com/RepKevinBrady/status/945376100535894016.

46.     Senate Finance Committee Chairman Orrin Hatch (R-Utah) likewise emphasized
that the bill "preserves . . . the deduction for charitable contributions." Chairman Orrin Hatch,
Remarks Opening Finance Committee Markup of Tax Cuts and Jobs Act, Nov. 13, 2017,
https://www.finance.senate.gov/chairmans-news/hatch-opening-statement-at-finance-committee-
markup-of-tax-cuts-and-jobs-act.

47.     As Senator John Hoeven (R-ND) put it succinctly: "We continue the deductibility
of charitable contributions." *See* 163 Cong. Rec. S7873 (Statement of Sen. Hoeven).

48.     The Act did amend Section 170 in certain respects—*e.g.*, increasing the percentage
of a taxpayer's income that is deductible under Section 170 for cash donations and preventing
taxpayers from deducting donations for college athletic event seating rights. *See* Pub. L. No. 115-
97, §§ 11023, 13704; H.R. Rep. 115-466 (Conference Report), at 273. These amendments suggest
that Congress knew how to modify Section 170—even to account for the value received in
exchange for contributions (namely, the college athletic event seating rights).

49.     Yet, in keeping with more than a century of precedent, the Act did not amend
Section 170 to require taxpayers to reduce their charitable deductions by the amount of any tax
benefits received as a result of a contribution. While the Act did amend Section 164 of the Code
to place a $10,000 cap on the SALT deduction, that provides no basis for a reinterpretation of
Section 170, an entirely different provision of the Code.

50.     Nevertheless, on May 23, 2018, the IRS announced that it would be proposing new
regulations addressing the deductibility of charitable contributions made in exchange for state and

local tax credits. The IRS stated that it proposed the new rule in response to new legislation enacted by "some State legislatures," including the Plaintiff States, to establish new state and local tax credit programs for charitable contributions. *See* IRS Notice 2018-54 (May 23, 2018).

51. On August 27, 2018, the IRS issued a Notice of Proposed Rulemaking. Under the proposed rule, taxpayers would be required to subtract the value of state or local tax credits they received from the amount of their federal charitable contribution deduction. *See* Contributions in Exchange for State or Local Tax Credits, 83 Fed. Reg. 43563 (Aug. 27, 2018) ("Proposed Rule").

52. On October 11, 2018, the Plaintiff States submitted a comment letter to the IRS opposing the Proposed Rule. In the comment letter, the Plaintiff States laid out that the Proposed Rule was arbitrary and capricious and contrary to law because it treated tax credits—but not tax deductions—as evidence of a *quid pro quo* that diminishes the amount deductible as a charitable contribution; and because the proposed 15 percent exception created an arbitrary "cliff effect" for contributions that trigger tax credits worth more than 15 percent of the donation. In addition, the Plaintiff States explained that the Proposed Rule would harm the interests of taxpayers, charities, and state and local governments, and disturb their reliance on the IRS's longstanding approach.

53. Within weeks of the release of the Proposed Rule, the IRS began creating carve outs. For example, on September 5, 2018, the IRS issued a notice entitled "Clarification for business taxpayers: Payments under state or local tax credit programs may be deductible as business expenses." IR-2018-178, Sept. 5, 2018. This "clarification" announced that "[b]usiness taxpayers who make business-related payments to charities or government entities for which the taxpayers receive state or local tax credits can generally deduct the payments as business expenses." *Id.*

11

54.     In a press release accompanying this clarification, Defendant Mnuchin added that "[t]he recent proposed rule concerning the cap on state and local tax deductions has no impact on federal tax benefits for business-related donations to school choice programs." Press Release, Treasury Secretary Mnuchin Statement on Clarification for Business Taxpayers: Contributions Under State and Local Tax Credit Programs Generally Deductible as Business Expenses (Sept. 5, 2018), available at https://home.treasury.gov/news/press-releases/sm472.

55.     On December 28, 2018, the IRS released Revenue Procedure 2019-12, which formalized this "safe harbor" for business expenses.

56.     On June 13, 2019, the IRS published the Final Rule.

57.     Despite the myriad objections the IRS received, the Final Rule largely mirrors the Proposed Rule. Like the Proposed Rule, the Final Rule requires taxpayers to subtract the value of SALT credits from the amount of their charitable deductions. 84 Fed. Reg. at 27515. As the IRS acknowledges, the Final Rule thus "depart[s] from the conclusion of the 2010 CCA in important respects." *Id.* at 27516. The Final Rule both "distinguish[es] the value of a state tax deduction, and the value of a state tax credit" and "draw[s] a bright-line distinction based on the amount of the tax benefit in question." *See* 2010 CCA at 4–5.

58.     First, while the Final Rule requires taxpayers to subtract the value of SALT credits from their federal charitable deduction, it does not require taxpayers to subtract the value of federal, state, or local deductions. *See* 84 Fed. Reg. at 27520–21 (stating that "[u]nder the final regulations neither state nor federal charitable contribution deductions are treated as return benefits in determining the taxpayer's charitable contribution deduction under section 170").

59.     Second, recognizing this disparity between tax credits and tax deductions, the Final Rule purports to "equalize" the treatment of deductions and credits by creating a new 15 percent

exception for contributions yielding state or local tax credits that do not exceed 15 percent of the donation. *Id.* at 27515. That is, a taxpayer who makes a contribution that triggers a state or local tax credit worth 15 percent or less of the donation may claim a deduction for the full contribution, while a taxpayer who makes a contribution that yields a tax credit worth more than 15 percent of the donation must subtract the value of the credit from the deduction.

60.     The Final Rule reaffirmed the safe harbor for business expenses recognized in Revenue Procedure 2019-12.

61.     The Final Rule also recognized an additional safe harbor. Under IRS guidance issued the same day as the Final Rule, the IRS announced that it anticipates issuing a rule to allow taxpayers to treat as state and local tax payments any charitable contributions made to qualifying Section 170(c) organizations. The safe harbor would protect donors whose SALT liability falls below the $10,000 cap. For taxpayers whose SALT liability exceeds the cap, the safe harbor would confer no benefit. The effect of this carve out thus would be to disadvantage taxpayers in states with comparatively high state and local tax rates, including in the Plaintiff States.

62.     Among other things, the IRS offered revenue-based explanations to justify its new approach to understanding a donor's charitable intent under Section 170. For one, the IRS argued that continuing to allow full deductions for charitable contributions that generate state or local tax credits would substantially reduce the revenue gains from the newly-enacted SALT deduction cap, so the agency had to interpret Section 170 to avoid this result. *See, e.g.*, 84 Fed. Reg. at 27523 (asserting that "[a] substantial amount of this revenue [*i.e.*, from the SALT deduction cap] would be lost if state tax benefits received in exchange for charitable contributions were ignored"). By contrast, the IRS determined that it could continue to ignore the tax deductions that same taxpayer received because "the potential revenue loss" to the IRS of those deductions is "comparatively

low." *Id.* at 27521. Finally, the IRS said its change would have limited impacts on any charities because "90 percent of taxpayers will not claim itemized deductions of any kind" and so these taxpayers "are entirely unaffected" and will have the same incentives to contribute to charities as before. *Id.* at 27528.

## THE FINAL RULE IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS

63.     The Final Rule is contrary to Section 170 because it treats the receipt of SALT credits as a *quid pro quo* that diminishes the value of a federal charitable deduction. Such treatment marks a radical departure from the plain language and logic of Section 170, and from longstanding precedent and practice. As noted above, courts and the IRS have consistently treated tax benefits as a simple reduction in tax liability rather than a *quid pro quo* that negates charitable intent, even when those benefits came in the form of tax credits. In light of that long history, Congress has had numerous opportunities to amend Section 170 to alter the treatment of tax credits—most recently, during the 2017 federal tax overhaul. Had Congress wished to upend more than a century of precedent, it would have done so in clear terms (just as Congress did in making clear in the 2017 law that other benefits—*e.g.,* athletic event seating rights—*do* negate a donor's charitable intent). Congress has not done so, and the IRS cannot be permitted to arrogate Congressional power.

64.     The Final Rule is also "not in accordance with law" and "arbitrary [and] capricious" for three additional reasons. *See* 5 U.S.C. § 706(2)(A), (C).

### The Final Rule's Treatment of Tax Credits vs. Tax Deductions

65.     Although the Final Rule requires taxpayers to subtract the value of SALT credits from their federal charitable contribution deduction, it does not require the same taxpayers to subtract the value of federal, state, or local deductions. That disparity engenders at least two legal problems, including but not limited to the following:

14

66.     First, the Final Rule's reliance on a distinction between tax benefits in the form of credits and tax benefits in the form of deductions is irrational. Credits and deductions are two kinds of benefits designed to promote charitable giving, and they do this in the same way—by lowering a taxpayer's tax liability. At most, the difference between credits and deductions is a difference in degree, not a difference in kind. Nowhere in the Final Rule does the IRS properly explain how the two operate differently, or why the receipt of a tax benefit via a credit negates a donor's charitable intent while the receipt of a tax benefit via a deduction does not. That is because no sufficient reason exists. It follows that a system that disfavors tax credits while favoring tax deductions that are aimed at the same goal is impermissibly arbitrary. The fact that tax benefits can accrue to a donor from federal, state, and local tax deductions without bearing on the IRS's enforcement of Section 170, but that tax benefits accruing to a donor from credits dramatically reduce the value of a charitable deduction, thus proves fatal to the rule.

67.     Second, the Final Rule's divergent treatment of fundamentally similar tax benefits is impossible to square with the text of Section 170, which the Rule purports to interpret. Section 170 permits a donor to take a deduction for "any charitable contribution … made within the taxable year." 26 U.S.C. § 170. The plain text offers no basis for concluding that a donation is "charitable" if it is incentivized by the prospect of a benefit in the form of a tax deduction, but is not "charitable" if it is incentivized by the prospect of a benefit in the form of a tax credit. If Congress had intended to draw such a distinction in the implementation of Section 170, it would have done so clearly.

68.     For the same reason, the Final Rule undermines the purpose of Section 170, which is to promote charitable giving by providing tax benefits to donors.

The Final Rule's 15 Percent Exception for Tax Credits

69.     The IRS's decision to create an exception for contributions that yield SALT credits worth 15 percent or less of the donation is also both (1) contrary to the text of Section 170 and (2) arbitrary and capricious. In the Final Rule, the IRS purports to "equalize" the treatment of tax deductions and credits by creating a 15 percent exception for contributions that yield tax credits worth 15 percent or less of the donation. *Id.* at 27515. That is, a taxpayer who makes a contribution that triggers a credit worth 15 percent of the donation or less may claim a deduction for the full contribution, while a taxpayer who makes a contribution that yields a credit worth more than 15 percent of the donation must subtract the value of the credit from the deduction.

70.     This exception has no basis in the text of Section 170, which allows for deductions for contributions that are "charitable" in nature. No dictionary definition, no plain usage, and no amount of logic supports the conclusion that a donation is "charitable" if it triggers a SALT credit worth 15 percent of the donation or less, but is not "charitable" if the SALT credit crosses the 15 percent threshold. Because this distinction does not flow from any plausible interpretation of the term "charitable" in Section 170, it is an act of legislative policy-making rather than a permissible interpretation of the statutory text.

71.     Not only does the 15 percent exception depart from the text of Section 170, but it also gives rise to an arbitrary and capricious "cliff effect." On the one hand, according to the IRS, a SALT credit worth 15 percent of a donation or less does not diminish the value of a charitable deduction, while on the other hand, taxpayers must subtract the value of credits worth 16 percent of a donation from their charitable deductions. This express "cliff effect" creates arbitrary disparities in the treatment of substantially similar taxpayers and lacks any basis in logic.

16

72.     Moreover, the 15 percent exception gives rise to additional arbitrary disparities in the treatment of SALT credits vis-à-vis federal, state, and local deductions. The IRS attempts to justify the 15 percent threshold by suggesting that it approximates the maximum value of state and local deductions for charitable contributions. 84 Fed. Reg. at 27520. That, however, represents an ahistorical analysis of the Code rooted in the happenstance of current tax rates, which are always subject to change (and have changed repeatedly in the past).

73.     In any event, the 15 percent exception does not address the Final Rule's inconsistent treatment of SALT credits and *federal* deductions. Federal deductions often yield tax advantages well in excess of the IRS's 15 percent threshold. For 2019, the top marginal income tax rate for federal taxation purposes is 37 percent. Thus, a taxpayer in the top marginal federal income tax bracket receives a benefit worth 37 cents on the dollar for every qualifying charitable contribution. Yet the Final Rule does not compel donors to subtract that benefit from their federal charitable deduction. By contrast, the Final Rule requires taxpayers who receive a SALT credit worth 16 percent of a contribution—less than half the value of a federal deduction for a taxpayer in the top marginal tax bracket—to subtract the full amount of the credit from a charitable deduction. Not only is such divergent treatment irrational, but it also unfairly discriminates against states and localities (whose tax credits diminish the value of a charitable contribution) relative to the federal government (whose tax incentives do not affect the value of a charitable contribution).

74.     This arbitrary disparity in the treatment of SALT credits and federal tax deductions would have been even more pronounced under prior iterations of the Code. In 1960, for instance, the value of a federal deduction for taxpayers in the top marginal tax bracket would have been 91 percent of a charitable contribution. In 1977, it would have been 70 percent of the contribution. Yet, despite the substantial benefits of federal tax deductions—up to 91 percent of a contribution

in 1960—federal tax law has never considered the tax benefits of a charitable deduction to be a return benefit negating charitable intent. The IRS nowhere accounts for this problem, nor does it explain why a donation is not "charitable" if motivated by a 16 percent tax credit but was charitable when motivated by a 91 percent tax deduction.

75.     Coupled with the Final Rule's carve outs for business taxpayers and taxpayers with SALT liability below the $10,000 cap, the 15 percent exception shows that the Final Rule derives not from any defensible interpretation of the plain text of Section 170, but rather from the IRS's desire to substitute its policy preferences for those of Congress. The IRS has no authority to do so.

The Final Rule's Impermissible, Incomplete, and Inaccurate Impacts Analysis

76.     The IRS also abandoned Section 170 and acted in an arbitrary and capricious way by importing and miscalculating a range of impacts in justifying the Final Rule.

77.     In defending its Final Rule, the IRS makes three important assertions—and each one supplies an independent reason to vacate the rule:

a.     First, the agency claims—without any meaningful empirical evidence—that continuing to allow for a full federal deduction for charitable contributions that generate SALT credits would substantially reduce the revenue gains from the newly enacted SALT deduction cap, necessitating an interpretation of Section 170 that avoids this result. *See, e.g.*, 84 Fed. Reg. at 27523 (asserting that "[a] substantial amount of this revenue [*i.e.*, from the new SALT cap] would be lost if state tax benefits received in exchange for charitable contributions were ignored in determining the charitable contribution deduction").

b.     Second, the IRS contrasts that conclusion with its belief that state and local tax *deductions* do not give rise to a *quid pro quo* because "the potential revenue loss" from such deductions is "comparatively low." *Id.* at 27521. According to the IRS, "[t]he

economic benefit of a state or federal charitable contribution deduction is limited because both are based on a taxpayer's marginal tax rate." *Id.*

      c.     Third, the IRS concludes that the Final Rule would have only a limited effect on charities because it "will leave charitable giving incentives entirely unchanged for the vast majority of taxpayers." *Id.* at 27528. In the IRS's telling, "after passage of the [Act] (which significantly increased the standard deduction), 90 percent of taxpayers will not claim itemized deductions of any kind," and these taxpayers "are *entirely unaffected* by this rule." *Id.* (emphasis added). According to the IRS, that 90 percent of taxpayers are entirely unaffected will mitigate the impacts on charities.

78.     At the outset, neither of the first two considerations has any basis in Section 170 and could not have been relevant to the IRS's understanding of a *donor*'s charitable intent. Section 170 provides no basis for interpreting its terms in light of potential revenue gains or losses. There is no connection between protection of federal revenue streams and the meaning of "charitable" under Section 170—and no dictionary definition or plain usage suggests that one exists. To the contrary, in adopting revenue considerations as a relevant guide for statutory construction, the IRS has taken on the improper role of policy-maker and supplanted Congress's own judgment.

79.     Regardless, each of these assertions is fundamentally flawed and thus renders the Final Rule arbitrary and capricious. Start with the purported revenue loss. Although the IRS purported to justify the Final Rule on the ground that it was necessary to preserve revenue, the IRS did not complete a "revenue estimate of the rule." 84 Fed. Reg. at 27523. Instead, it cites only the Joint Committee on Taxation's estimate that the Act's $10,000 limitation on the SALT deduction, along with other miscellaneous changes to individual deductions, will generate $668 billion for the federal government over ten years. *See id.* As the IRS acknowledges, this is merely "a rough

upper bound of the potential revenue loss." *Id.* The Final Rule does not attempt to resolve the relevant inquiry: namely, how much of the projected $668 billion in federal revenue would be lost were the IRS to adhere to precedent and affirm the full deductibility of charitable contributions that yield tax benefits.

80.     The IRS also fails to substantiate its claim that the revenue loss from permitting a full federal charitable deduction for charitable contributions that entitle a donor to a state or local tax deduction will be "comparatively low." *Id.* at 27520. As an initial matter, the IRS makes no attempt to quantify the revenue loss that results from allowing a full federal deduction for charitable contributions made in exchange for state or local tax deductions, as compared to the expected revenue loss that would result from disallowing the federal deduction for state and local tax credits—the very comparison on which it purports to rely. Moreover, the IRS ignores the history of federal marginal tax rates in making this assertion. As explained above, the value of a federal deduction for taxpayers in the top marginal tax bracket has at times been as high as 91 percent of a charitable contribution. The IRS's comparative revenue calculations do not take this history into account, and the IRS offers no guidance or position on how a higher top marginal tax rate would alter its analysis of Section 170. Also, the IRS makes no attempt to quantify the revenue loss that results from allowing full deductibility of charitable contributions as compared to the expected revenue loss that would result from disallowing deductibility for state and local tax credits—again, the very comparison on which it purports to rely.

81.     Furthermore, when it comes to the IRS's discussion of the effect of the Final Rule on charities, the agency reaches a conclusion that is demonstrably wrong. The IRS maintains "this rule will leave charitable giving incentives entirely unchanged for the vast majority of taxpayers" because "90 percent of taxpayers will not claim itemized deductions of any kind" and are thus

"entirely unaffected by this rule." *Id.* at 27528. That is incorrect, because the IRS never considers how the Final Rule affects the taxpayer's *decision* to itemize or take the standard deduction and thus affects her incentives to make additional charitable contributions.

82.     Because the Final Rule reduces the value of the federal charitable deduction for contributions that trigger SALT credits, it diminishes the pool of taxpayers for whom it makes economic sense to itemize rather than claim a standard deduction—which the Act set at $12,000 for individual filers and $24,000 for married couples filing jointly. Taxpayers who itemize have a stronger incentive to make charitable contributions than do taxpayers who claim the standard deduction because they are the only ones who benefit from the federal charitable deduction. By disallowing the federal deduction for contributions that trigger SALT credits, the Final Rule diminishes the pool of taxpayers who will itemize, and for whom there will be a further economic incentive to make contributions. Thus, the Final Rule weakens incentives to contribute to *any* charitable institutions for a larger pool of taxpayers than the Final Rule mistakenly contends. In other words, the behavior of a portion of the "90 percent of taxpayers [who] will not claim itemized deductions of any kind" *will* be affected, and will be less likely to contribute charitably, thus harming charities more than the Final Rule suggests.

83.     Each of these three incomplete or mistaken assumptions sufficiently undermines the ultimate cost-benefit analysis that undergirds the Final Rule.

## **THE IRS FAILED TO COMPLY WITH THE REGULATORY FLEXIBILITY ACT**

84.     In contrast to its over-willingness to rely on unsupported federal revenue considerations, the IRS entirely fails to assess a fourth consideration: the Final Rule's fiscal impact on state and local governments. Its failure to do so constitutes a violation of the Regulatory Flexibility Act, 5 U.S.C. § 601 *et. seq.* ("RFA").

85.     Under the RFA, when an agency issues a "notice of proposed rulemaking for any proposed rule, or publishes a notice of proposed rulemaking for an interpretative rule involving the internal revenue laws of the United States, the agency shall prepare and make available for public comment an initial regulatory flexibility analysis. Such analysis shall describe the impact of the proposed rule on small entities." 5 U.S.C. § 603(a).

86.     Small entities include "small governmental jurisdiction[s]," which in turn encompass "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand." 5 U.S.C. § 601(5)-(6).

87.     Under the RFA, "[w]hen an agency promulgates a final rule under section 553 of this title," or "promulgates a final interpretative rule involving the internal revenue laws of the United States, the agency shall prepare a final regulatory flexibility analysis." 5 U.S.C. § 604(a).

88.     Agencies are exempt from the RFA's mandate only when "the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b).

89.     The RFA applies here, because this Final Rule will likely have a "significant economic impact" on "governments of cities, counties, towns, townships, villages, school districts, or special districts" that enacted charitable tax credit programs, and that are under financial strain from the SALT deduction cap. *See* 5 U.S.C. §§ 601(5)-(6), 605(b).

90.     Nevertheless, in contravention of its obligations under the RFA, the IRS does not even attempt to examine the ramifications of the Final Rule for local governments—let alone produce the full analysis that the RFA demands.

91.     In publishing the Proposed Rule, the IRS did not "prepare and make available for public comment an initial regulatory flexibility analysis … [that] shall describe the impact of the

22

proposed rule on small entities." 5 U.S.C. § 603(a). Nor, upon publication of the Final Rule, did

the IRS "prepare a final regulatory flexibility analysis." 5 U.S.C. § 604(a).

92.    Thus, despite the Final Rule's significant economic impact on small governmental

jurisdictions in the Plaintiff States, the IRS failed to comply with the RFA.

## THE IRS'S FINAL RULE HARMS THE PLAINTIFF STATES

93.    As stated above, 33 states have developed more than 100 programs that offer SALT

credits for charitable donations to qualifying institutions.

94.    These programs encourage charitable giving and citizen engagement, ensure the

financial viability of philanthropic organizations, relieve the burdens on state and local

governments, and promote a vibrant civil society. *See* Peter J. Wiedenbeck, *Charitable

Contributions: A Policy Perspective*, 50 Mo. L. Rev. 85, 92-96 (1985).

95.    The newly enacted $10,000 cap on the SALT deduction amplified the importance

of such programs.

96.    To ease the burden of the Act's cap on the SALT deduction, several states—

including the Plaintiff States—have established programs that entitle taxpayers to SALT credits

for contributions to charitable funds established by state and local governments. *See* Joseph

Bankman, David Gamage, Jacob Goldin, Daniel J. Hemel, Darien Shanske, Kirk J. Stark, Dennis

J. Ventry Jr., and Manoj Viswanathan, *Caveat IRS: Problems with Abandoning the Full Deduction

Rule*, 88 Tax Notes 547, 547 n.1 (2018).

97.    Most of these programs do not provide dollar-for-dollar tax credits and thus yield a

net increase in state and local revenues. *See* Joseph Bankman, David Gamage, Jacob Goldin,

Daniel Hemel, Darien Shanske, Kirk J. Stark, Dennis J. Ventry Jr., and Manoj Viswanathan, *State

Response to Federal Tax Reform*, 88 Tax Notes 557 (2018).

98.     In 2018, New York enacted legislation that, among other things, permits taxpayers to make charitable contributions to a state-sponsored charitable gifts trust fund that offers SALT credits worth 85 percent of the contribution. Money collected in the fund must be used to support public purposes for New York State residents. *See* State Finance Law § 92-gg; Tax Law § 606(ggg)(iii). The law also authorized localities to establish similar charitable gift reserve funds, and to offer tax credits toward residents' local property taxes equal to 95 percent of the value of the contribution. *See* General Municipal Law §§ 6-t, 6-u; Real Property Tax Law § 980-a.

99.     New Jersey has enacted legislation authorizing "local units"—*i.e.,* a "municipality, county, or school district"—to establish "charitable funds for specific public purposes of that local unit," and entitling donors to a property tax credit worth 90 percent of the contribution. N.J.S.A. 54:4-66.6, -66.7, -66.9.

100.    Connecticut has enacted legislation authorizing municipalities to designate "community supporting organizations" to receive qualifying cash donations and entitling residential property owners to tax credits not to exceed the lesser of (i) the amount of property tax owed, or (ii) 85 percent of the amount of the donation. Conn. Gen. Stat. § 12-129v.

101.    All of these programs generally work as follows. For a taxpayer who owes $20,000 in property taxes, only the first $10,000 remains deductible under the SALT deduction cap. For the remaining $10,000, a taxpayer might choose to donate $10,000 to a state or local charitable fund established under the charitable tax credit program. In New Jersey, to use one example, the taxpayer would receive a tax credit worth 90 percent of the donation—in this case, a $9,000 property tax credit. (In a state where the tax credit is worth 85 percent of the donation, she would simply receive an $8,500 property tax credit.) The taxpayer would then pay the remaining $1,000 in property tax liability to the local unit in question.

102.     That has a direct benefit for the recipient governmental entity. In the example laid

out above, the state or local unit would collect $11,000 on the donation (the $10,000 donation plus

the $1,000 in property tax payments)—a $1,000 (or ten percent) increase over the baseline scenario

in which the taxpayer simply satisfies the $10,000 tax liability through other channels. As a result,

participation in these programs means additional funds for the recipient government entity's

coffers, which that government can in turn spend on vital services for its residents.

103.     The Final Rule would upend these programs, nullifying the will of state legislatures

in the Plaintiff States and across the country and reducing the monies available to that government

to spend on vital services. The Final Rule does this by eliminating the force of the very incentives

the state legislatures provided for participating in them.

104.     The example above demonstrates why the Final Rule will directly reduce the funds

available to the recipient governments. In the example above, absent the Final Rule, a donor has

now paid $11,000 in connection with the donation ($10,000 to the charitable fund plus $1,000 for

the remaining tax liability after receipt of the $9,000 credit). The donation, however, would remain

fully deductible for federal tax purposes. Thus, if the donor were in the top marginal federal tax

bracket (37 percent), the charitable deduction would yield tax savings worth $3,700, bringing the

effective tax liability down to $7,300—$2,700 less than if the taxpayer simply paid the additional

$10,000 in state and local tax liability.

105.     Under the Final Rule, by contrast, taxpayers who participate in charitable tax credit

programs would face a higher effective tax rate than they would if they simply paid the $10,000

in state and local taxes outright. Indeed, the Final Rule would require the taxpayer to subtract the

value of the property tax credit ($9,000) from the amount of the contribution to the charitable fund

($10,000), leaving a federal charitable deduction of only $1,000. Thus, the taxpayer would have

paid $11,000 ($10,000 to the charitable fund plus $1,000 for the remaining tax liability after receipt of the $9,000 credit), and the $1,000 federal deduction would save the taxpayer only $370 in federal taxes, bringing the taxpayer's effective tax liability to $10,630—$630 more than if the taxpayer had simply satisfied the $10,000 in state and local tax liability outright.

106.    The Final Rule thus undermines the incentive for taxpayers to donate to state and local charitable funds that generate a net increase in state and local government revenue. The direct consequence of the Final Rule is less money in state and local government coffers.

107.    The Plaintiff States have a sovereign and proprietary interest in protecting a net increase in state revenue that would strengthen the Plaintiff States' fiscal health and their capacity to carry out their sovereign functions.

108.    The Plaintiff States also have a proprietary, sovereign, and quasi-sovereign interest in protecting the charitable revenue streams that flow to State institutions and other charitable organizations. As explained above, by diminishing the value of charitable deductions, the Final Rule reduces the incentive to itemize, which in turn weakens the incentive to make charitable contributions. This diminished incentive will hurt charities in the Plaintiff States, and it will harm the Plaintiff States themselves by reducing the flow of contributions to state colleges and universities and their affiliated charitable foundations.

109.    In addition, the Plaintiff States have an interest in protecting a net increase in revenue for their governmental subdivisions, including counties, municipalities, and school districts. As with a net increase in state revenue, a net increase in local revenue will bolster local finances and the capacity of local governments to support critical social services. Furthermore, it will directly reduce the need for state governments to provide aid to those local units. The Plaintiff States' financial condition is interwoven with that of their local subdivisions. In New Jersey, for

instance, the State provides aid to localities "for the maintenance and support of a thorough and efficient system of free public schools." N.J. Const. Art. 8, § 4, ¶ 1. State and local governments jointly fund public education in New Jersey, and a net increase in revenue that localities allocate to public education would help relieve the funding pressures on the State.

110.    For all these reasons, the Plaintiff States have a proprietary, sovereign, and quasi-sovereign interest in the charitable tax credit programs that the Final Rule upends.

111.    Finally, the Plaintiff States have an interest in lessening the tax burden for their residents—particularly in light of the newly enacted cap on the SALT deduction—and in protecting their residents' ability to participate in programs that incentivize charitable giving and generate a net increase in revenue for the Plaintiff States.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Substantive Violation of the Administrative Procedure Act (Contrary to Law)

112.    The Plaintiff States incorporate by reference the foregoing paragraphs of this Complaint as if set forth at length herein.

113.    The Final Rule is a final agency action.

114.    Under the APA, courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; and/or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

115.    The APA forbids agencies from acting outside their statutory authority, and the agency cannot grant itself power via regulation that conflicts with plain statutory text.

116.   "It is well settled that an agency may act only within the authority granted to it by statute. This principle is a recognition of the nature of an administrative agency as a creature of statute, having no constitutional or common law existence or authority, but *only* those authorities conferred upon it by Congress." *Natural Resources Defense Council v. National Highway Traffic Safety Administration*, 894 F.3d 95, 108 (2d Cir. 2018) (emphasis in original).

117.   The agency must not "trespass beyond the bounds of its statutory authority by taking other factors into account than those to which Congress limited it, nor substitute new goals in place of the statutory objectives without explaining how doing so comports with the statute." *North Carolina v. E.P.A.*, 531 F.3d 896, 919 (D.C. Cir. 2008).

118.   "It is axiomatic that the plain meaning of a statute controls its interpretation, and that judicial review must end at the statute's unambiguous terms. Legislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous." *Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999).

119.   The Final Rule is "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(A), (C), because it interprets Section 170 in a manner that is inconsistent with the text, purpose, and history of that provision in four ways:

    a.    It treats a SALT credit as a *quid pro quo* when received in return for making a charitable contribution, such that the contribution no longer qualifies for a full federal charitable deduction;

    b.    It treats a donor's receipt of tax benefits in the form of credits—but not tax benefits in the form of deductions—as diminishing her charitable intent;

    c.    It treats a donor's receipt of tax credits worth more than 15 percent of the underlying donation—but not tax credits worth 15 percent or less of the underlying donation—as diminishing her charitable intent; and

28

     d.    It considers impermissible factors in justifying its interpretation, ignores other relevant factors, and repeatedly mischaracterizes the impacts of the Final Rule.

## SECOND CAUSE OF ACTION

### Substantive Violation of the Administrative Procedure Act (Arbitrary and Capricious)

120.    The Plaintiff States incorporate by reference the foregoing paragraphs of this Complaint as if set forth at length herein.

121.    "A fundamental norm of administrative procedure requires an agency to treat like cases alike." *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007). Indeed, "[a] long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently." *Transactive Corp v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996).

122.    In addition, an agency must "provide a reasoned explanation" for its decisions— including for its change of position—which includes "show[ing] that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quoting *FCC v. Fox*, 556 U.S. 502, 515 (2009)). That includes a requirement that an agency must be "cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* at 2120 (citations and quotation marks omitted).

123.    The Final Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; and/or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" for three reasons:

     a.    It treats a donor's receipt of tax benefits in the form of credits—but not tax benefits in the form of deductions—as diminishing her charitable intent;

> b.    It treats a donor's receipt of tax credits worth more than 15 percent of the underlying donation—but not tax credits worth 15 percent or less of the underlying donation—as diminishing her charitable intent; and
>
> c.    It considers impermissible factors in justifying its interpretation, ignores other relevant factors, and repeatedly mischaracterizes the impacts of the Final Rule.

124.    Because Defendants failed to comply with the APA's requirements and took a final action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "contrary to constitutional right, power, privilege, or immunity," the Final Rule should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2).

## THIRD CAUSE OF ACTION

### Violation of the Regulatory Flexibility Act

125.    The Plaintiff States incorporate by reference the foregoing paragraphs of this Complaint as if set forth at length herein.

126.    By failing to assess the fiscal impact on small governmental jurisdictions, the Final Rule violates the RFA.

127.    In violation of the RFA, the IRS failed to "prepare and make available for public comment an initial regulatory flexibility analysis … [that] shall describe the impact of the proposed rule on small entities." 5 U.S.C. § 603(a).

128.    In addition, the IRS failed to "prepare a final regulatory flexibility analysis" upon publication of the Final Rule." 5 U.S.C. § 604(a).

129.    The Final Rule will have a "significant economic impact" on "small governmental jurisdiction[s]," and thus it is not exempt from the RFA. 5 U.S.C. §§ 601(5)-(6), 605(b).

130.    Accordingly, the Final Rule violates the RFA.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff States request that this Court enter judgment in their favor and grant the following relief:

a.  Declare the Final Rule unlawful;

b.  Vacate the Final Rule;

c.  Permanently enjoin the application of the Final Rule;

d.  Award the Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

e.  Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

DATED: July 17, 2019

GURBIR S. GREWAL
Attorney General of New Jersey

s/ *Jeremy M. Feigenbaum*
JEREMY M. FEIGENBAUM
GLENN J. MORAMARCO
Assistant Attorneys General
(*pro hac vice* motion pending)
ERIC APAR
Deputy Attorney General
(*pro hac vice* motion pending)
New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 376-3235
Glenn.Moramarco@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

LETITIA JAMES
Attorney General of New York

s/ *Caroline A. Olsen*
CAROLINE A. OLSEN
Assistant Solicitor General
MATTHEW COLANGELO
Chief Counsel for Federal Initiatives
STEVEN C. WU
Deputy Solicitor General
ERIC R. HAREN
Special Counsel to the Solicitor General
New York Office of the Attorney General
28 Liberty Street, 23rd Floor
New York, NY 10005
(212) 416-6184
Caroline.Olsen@ag.ny.gov
*Attorneys for Plaintiff State of New York*


WILLIAM TONG
Attorney General of Connecticut

s/ *Joseph J. Chambers*
JOSEPH J. CHAMBERS
Assistant Attorney General
Connecticut Office of the Attorney General
P.O. Box 120
55 Elm Street
Hartford, CT 06141-0120
(860) 808-5270
joseph.chambers@ct.gov
*Attorney for Plaintiff State of Connecticut*