UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW JERSEY, STATE OF
NEW YORK, and STATE OF
CONNECTICUT,

                              Plaintiffs,

                - against -

STEVEN T. MNUCHIN, in his official
capacity as Secretary of the United States
Department of the Treasury, CHARLES P.
RETTIG, in his official capacity as
Commissioner of the Internal Revenue
Service, UNITED STATES DEPARTMENT
OF THE TREASURY, and INTERNAL
REVENUE SERVICE,

                              Defendants.

VILLAGE OF SCARSDALE, NEW YORK,

                              Plaintiff,

                - v. —

INTERNAL REVENUE SERVICE,
CHARLES P. RETTIG, in his official
capacity as Commissioner of Internal
Revenue, UNITED STATES
DEPARTMENT OF THE TREASURY, and
STEVEN T. MNUCHIN, in his official
capacity as Secretary of the Treasury,

                              Defendants.

**MEMORANDUM
OPINION & ORDER**

19 Civ. 6642 (PGG)
19 Civ. 6654 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

            On December 22, 2017, Congress enacted legislation that capped deductions of

state and local taxes ("SALT") for married couples and single taxpayers at $10,000.  26 U.S.C.

§ 164(b)(6).  This legislation effected a significant change in the federal income tax regime.  (19

Civ. 6642, Dkt. No. 8 (Cmplt.) ¶ 24; 19 Civ. 6654, Dkt. No. 1 (Cmplt.) ¶ 5)  In response to this legislation limiting deductions of SALT at the federal level, New York, New Jersey, Connecticut and the Village of Scarsdale ("Plaintiffs") enacted legislation authorizing tax credit programs that allowed residents to make charitable contributions to their state or municipality and receive a tax credit in return.  (19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶¶ 2, 28, 96-100; 19 Civ. 6654, Dkt. No. 1 (Cmplt.) ¶¶ 19-23)

On June 13, 2019, the Treasury Department and the Internal Revenue Service ("IRS") promulgated a new regulation (the "2019 Final Rule") governing the availability of charitable contribution deductions for payments made to state and local governmental units where the taxpayer receives or expects to receive a state or local tax credit in return.  84 Fed. Reg. 27513 (June 13, 2019) (the "2019 Final Rule").  The new regulation involves an interpretation of the Internal Revenue Code of 1954 ("IRC" or the "Code") § 170, 26 U.S.C. § 170(a), which in part governs the deduction of charitable contributions on federal income tax returns.

The 2019 Final Rule provides that "the amount of the taxpayer's charitable contribution deduction under [S]ection 170(a) is reduced by the amount of any state or local tax credit that the taxpayer receives or expects to receive in consideration for the taxpayer's payment or transfer." 26 C.F.R. § 1.170A-1(h)(3)(i); see also 2019 Final Rule, 84 Fed. Reg. at 27514-15.

In this action, Plaintiffs seek a declaration that the 2019 Final Rule is invalid under the Administrative Procedure Act, 5 U.S.C. § 706.  (19 Civ. 6642, Dkt. No. 8 (Cmplt.) at 31; 19 Civ. 6654, Dkt. No. 1 (Cmplt.) at 16)[1]  Plaintiffs contend that Defendants – Treasury, the

---

[1]  19 Civ. 6642 and 19 Civ. 6654 are related cases, and briefing in the two cases has proceeded in tandem.  (See 19 Civ. 6642, Dkt. No. 40 (order setting common schedule for briefing); 19 Civ. 6654, Dkt. No. 25 (same))  Accordingly, this opinion addresses the motions filed in both cases.

IRS, and their officers (the "Government") – exceeded their statutory authority in promulgating the 2019 Final Rule, and that the issuance of the Rule was arbitrary and capricious.  (19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶¶ 112-30; 19 Civ. 6654, Dkt. No. 1 (Cmplt.) ¶¶ 67-78)

Defendants have moved to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, and under Rule 12(b)(6) for failure to state a claim.  (19 Civ. 6642, Dkt. No. 59; 19 Civ. 6654, Dkt. No. 44)  The parties have also cross-moved for summary judgment.  (19 Civ. 6642, Dkt. Nos. 57, 59; 19 Civ. 6654, Dkt. Nos. 44, 46)

For the reasons stated below, the Government's motion to dismiss will be granted in part and denied in part, and its motion for summary judgment will be granted.  Plaintiffs' motion for summary judgment will be denied.

## BACKGROUND[2]

## I. FACTS

### A. The 2017 Cap on SALT Deduction

Prior to tax year 2018, Section 164 of the Internal Revenue Code permitted taxpayers who itemize deductions on their federal income tax returns to deduct "all state and local income and property taxes" from their income (the "SALT deduction"), subject to certain limitations.  (See 19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶ 23; 19 Civ. 6654, Dkt. No. 1 (Cmplt.) ¶ 24; 26 U.S.C. § 164(a)(1)-(3), (b)(5) (effective Dec. 18, 2015 to Dec. 21, 2017))[3]

---

[2]  Unless otherwise noted, the Court's factual statement is drawn from the complaints.  Well-pled facts in a complaint are presumed true for purposes of resolving a motion to dismiss.  See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).

[3]  The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

On December 22, 2017, Congress enacted legislation that capped the SALT deduction for married couples and single taxpayers at $10,000.  (19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶ 24; 19 Civ. 6654, Dkt. No. 1 (Cmplt.) ¶¶ 25-26); see also An Act to Provide for Reconciliation Pursuant to Titles II and V of the Concurrent Resolution on the Budget for Fiscal Year 2018 (the "2017 Tax Act"), Pub. L. No. 115-97, § 11042, 131 Stat. 2054, 2085-86 (2017) (codified as amended 26 U.S.C. § 164(a)-(b)).[4]

### B.   The State and Local Tax Credit Programs

New York, New Jersey, Connecticut, and Scarsdale all have large numbers of residents whose SALT liability exceeds the $10,000 cap.  (19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶¶ 15-17, 27; 19 Civ. 6654, Dkt. No. 1 (Cmplt.) ¶ 13)  To mitigate the effects of the 2017 Tax Act on their residents, Plaintiffs "amended their respective tax laws to enable taxpayers to make contributions to state- or locality-affiliated charitable funds," and in return, taxpayers would "receive a state or local tax credit for their contribution."  (19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶ 28; see also 19 Civ. 6654, Dkt. No. 1 (Cmplt.) ¶¶ 22-23)  The credits could be used to offset individual state and local tax liability, and the residents could deduct the charitable contributions they made to state and municipal charitable funds on their federal income tax returns.[5]  Plaintiffs' new tax credit programs constituted an obvious effort to circumvent the $10,000 SALT deduction cap imposed by Congress in the 2017 Tax Act.

In 2018, New York enacted legislation that offered a taxpayer who contributed to a "charitable gifts trust fund" a state income tax "credit" equal to 85 percent of his or her

---

[4]  The SALT deduction cap became effective in tax year 2018.  26 U.S.C. § 164(b)(6); (see 19 Civ. 6654, Dkt. No. 1 (Cmplt.) ¶ 28)

[5]  Charitable contributions were, of course, not subject to the $10,000 SALT deduction cap enacted as part of the 2017 Tax Act.

contribution.  (19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶ 98); see N.Y. Tax Law § 606(ggg)(iii).  The

tax credit program was to be used to support the "public purposes" of healthcare or elementary

and secondary education for New York residents.  (19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶ 98); see

N.Y. Tax Law § 606(ggg)(iii).  The remaining 15 percent would "generate a net increase in

revenue" for the state.  (19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶ 28)  The New York legislation also

authorized "the governing board of any county or New York city," N.Y. Gen. Mun. Law § 6-t, or

"town or village," id. § 6-u, to establish similar programs and to offer real property tax credits

equal to 95 percent of the taxpayer's contribution.  (See 19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶ 98;

19 Civ. 6654, Dkt. No. 1 (Cmplt.) ¶¶ 19-21)

     On May 8, 2018, the Village of Scarsdale established a local tax credit program

stating that "[a]ny owner of real property located within the Village who makes an unrestricted

charitable monetary contribution to the Village's charitable gifts reserve . . . may claim a credit

against their Village property tax equal to 95 [percent] of the charitable gifts reserve fund

donation."  Scarsdale Local Law §§ 269-35, 269-37.  The remaining 5 percent of the contribution

"remains freely available for Scarsdale to use as it sees fit for its residents."  (19 Civ. 6654, Dkt.

No. 1 (Cmplt.) ¶ 23)

     New Jersey and Connecticut enacted similar legislation to circumvent the SALT

tax deduction cap set forth in the 2017 Tax Act.  New Jersey authorized any "municipality,

county, or school district" in the state to establish "charitable funds for specific public purposes

of that local unit," and to permit contributing taxpayers to take a property tax credit equal to 90

percent of the contribution.  N.J. Stat. Ann. §§ 55:4-66.6, 66.7, 66.9; (see 19 Civ. 6642, Dkt. No.

8 (Cmplt.) ¶ 99)  Connecticut authorized municipalities to "designate" certain Section 501(c)(3)

organizations as recipients of charitable contributions.  Residential property owners who

contributed to these organizations could receive a tax credit equal to the lesser of (1) "the amount of property tax owed," or (2) 85 percent of the amount of their cash donation.  Conn. Gen. Stat. § 12-129v; (see 19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶ 100)

In their Complaint, the States allege that "all of [their state and local tax credit programs] generally work as follows":

> For a taxpayer who owes $20,000 in property taxes, only the first $10,000 remains deductible under the SALT deduction cap.  For the remaining $10,000, a taxpayer might choose to donate $10,000 to a state or local charitable fund established under the charitable tax credit program.  In New Jersey, to use one example, the taxpayer would receive a tax credit worth 90 percent of the donation – in this case, a $9,000 property tax credit.  (In a state where the tax credit is worth 85 percent of the donation, she would simply receive an $8,500 property tax credit.)  The taxpayer would then pay the remaining $1,000 in property tax liability to the local unit in question.

(19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶ 101)  The taxpayer would also deduct the entire $10,000 donation – undiminished by the value of the New Jersey tax credit – from his or her federal individual income tax, as a charitable contribution under IRC §170(a).  (See id. ¶ 104)

C. **The 2018 Proposed Rule**

On August 27, 2018 – in response to efforts by states and localities to circumvent the cap on SALT deductions – the Treasury and the IRS issued a notice of proposed rulemaking concerning "the question of whether amounts paid or property transferred in exchange for state or local tax credits are fully deductible as charitable contributions under [IRC § 170]."  Contributions in Exchange for State or Local Tax Credits (the "2018 Proposed Rule"), 83 Fed. Reg. 43563, 43564 (August 27, 2018).

IRC § 170(a) provides:

> There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year.  A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary [of the Treasury].

26 U.S.C. § 170(a).  Subsection (b)(1)(A) of IRC § 170 states that a deduction "shall be allowed" for charitable contributions to "a governmental unit referred to in subsection (c)(1)" "to the extent that the aggregate of such contributions does not exceed 50 percent of the taxpayer's contribution base for the taxable year." Id. § 170(b)(1)(A)(v), (ix).  Subsection (c) lists the approved "governmental unit[s]" as "[a] State, a possession of the United States, or any political subdivision of any of the foregoing, or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes." Id. § 170(c)(1); (see 19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶¶ 31-33; 19 Civ. 6654, Dkt. No. 1 (Cmplt.) ¶ 29)

　　　　In proposing amendments to charitable contribution regulations issued pursuant to IRC § 170, the 2018 Proposed Rule acknowledges that "it has become increasingly common for states and localities to provide [SALT] credits in return for contributions by taxpayers." 2018 Proposed Rule, 83 Fed. Reg. at 43564.  Such programs provide "a potential means to circumvent the $10,000 limitation [on SALT deductions imposed in the 2017 Tax Act] by substituting an increased charitable contribution deduction for a disallowed state and local tax deduction." Id. "The Treasury Department and the IRS believe that when a taxpayer receives or expects to receive a state or local tax credit in return for a payment or transfer to [a governmental unit or affiliated] entity listed in [S]ection 170(c), the receipt of this tax benefit constitutes [a return benefit]" – "a quid pro quo" – "that may preclude a full [charitable contribution] deduction under [S]ection 170(a)." Id. at 43565.

　　　　As for state and local charitable contribution programs that offered a deduction on state and local taxes rather than a credit against state and local taxes, the 2018 Proposed Rule states that such a program does not constitute a quid pro quo unless the deduction the taxpayer would receive on his or her state return exceeds the amount of the donor's contribution.  The

2018 Proposed Rule's reasoning is that "the benefit of a dollar-for-dollar deduction is limited to the taxpayer's state and local marginal rate," and thus "the risk of deductions being used to circumvent [the 2017 Tax Rule] is comparatively low." Id.

The 2018 Proposed Rule contains an exception permitting charitable contributions made in exchange for state or local tax credits to be deducted on a federal income tax return where the tax credit amounts to no more than 15 percent of the amount the taxpayer contributed to a state or local entity. Id.

Treasury and the IRS provided for a period of public comment on the 2018 Proposed Rule. See id. at 43563. The agencies received more than 7,700 comments and 25 requests to speak at a November 5, 2018 public hearing. See 2019 Final Rule, 84 Fed. Reg. at 27514; (19 Civ. 6654, Dkt. No. 1 (Cmplt.) ¶ 40) About 70 percent of the comments recommended that the agencies "finalize the proposed regulations without change." 2019 Final Rule, 84 Fed. Reg. at 27515. New York, New Jersey, and Connecticut submitted comments opposing the 2018 Proposed Rule (19 Civ. 6642, (Dkt. No. 8) (Cmplt.) ¶ 52), and Scarsdale – as a member of the Coalition for the Charitable Contribution Deduction – submitted comments requesting that the 2018 Proposed Rule be withdrawn. (19 Civ. 6654, Dkt. No. 1 (Cmplt.) ¶ 41)

On December 28, 2018, in response to comments from businesses that make charitable contributions, the IRS issued guidance providing a "safe harbor[] . . . for certain payments made by a C corporation or a specified passthrough entity to or for the use of [a governmental unit] described in [S]ection 170(c)" if the business "expects to receive a state or local tax credit in return for such payment." Rev. Proc. 2019-12, 2019-04 I.R.B. 401 § 1. In other words, the agencies' final rule would not apply to C corporations and certain pass-through

entities, which would continue to be permitted to deduct as charitable contributions payments made to state or local tax authorities in exchange for a tax credit.  See id. §§ 3.02, 4.03.

The Treasury and the IRS also responded to comments "express[ing] concern . . . that the proposed regulations would create unfair consequences for certain individuals . . . who have total state and local tax liability for the year under $10,000" and "would have been able to deduct equivalent payments of state and local taxes offset by such credits."  Notice 2019-12, 2019-27 I.R.B.; see also 2019 Final Rule, 84 Fed. Reg. at 27519.  In June 11, 2019 guidance, the IRS states that the agencies' final rule will not apply to such individuals.  Notice 2019-12, 2019-27 I.R.B.

**D.    The 2019 Final Rule**

On June 13, 2019, Treasury and the IRS issued the 2019 Final Rule, which is the subject of the instant lawsuit.  The Final Rule become effective on August 12, 2019.  2019 Final Rule, 84 Fed. Reg. 27513.  The 2019 Final Rule "generally retain[s] the proposed amendments set forth in the proposed regulations."  Id. at 27514.

As to charitable contributions made to state or local governmental units in exchange for tax credits, the 2019 Final Rule provides that "the amount of the taxpayer's charitable contribution deduction under [S]ection 170(a) is reduced by the amount of any state or local tax credit that the taxpayer receives or expects to receive in consideration for the taxpayer's payment or transfer."  26 C.F.R. § 1.170A-1(h)(3)(i); see also 2019 Final Rule, 84 Fed. Reg. at 27514-15.

In promulgating this new rule, Treasury and the IRS interpret IRC §170 to provide

> a deduction for taxpayers' gratuitous payments to qualifying entities, not for
> transfers that result in receipt of valuable economic benefits.  In applying
> [S]ection 170 and the quid pro quo doctrine, the Treasury Department and the IRS

do not believe it is appropriate to categorically exempt state or local tax benefits from the normal rules that apply to other benefits received . . . by a taxpayer in exchange for a contribution. The final regulations are consistent with longstanding principles under [S]ection 170 and sound tax policy.

2019 Final Rule, 84 Fed. Reg. at 27515.

The "quid pro quo doctrine" referenced in the 2019 Final Rule provides that – where a taxpayer receives a benefit in return for his, her or its donation – the taxpayer is only permitted to deduct the net value of the taxpayer's donation as a "charitable contribution." Id. at 27513-14. Applying that doctrine here, if a taxpayer contributes $10,000 to a New Jersey tax credit program and receives a $9,000 state tax credit in return, under the 2019 Final Rule, the amount of the taxpayer's charitable contribution ($10,000) would – for purposes of the taxpayer's federal income tax return – be reduced by the value of the benefit the taxpayer received (the $9,000 state tax credit). Accordingly, the taxpayer could only claim a $1,000 charitable contribution deduction on the taxpayer's federal income tax return. See 26 C.F.R. § 1.170A-1(h)(3)(vii)(A).

The 2019 Final Rule retains the distinction previously drawn between charitable contributions made in exchange for tax credits and charitable contributions that could be deducted on the taxpayer's state or local tax return. While charitable contributions made in exchange for tax credits cannot be deducted on the taxpayer's federal income tax return, "the taxpayer is not required to reduce [his] charitable deduction under [S]ection 170(a)" if the taxpayer expects that the state and local tax deduction that he receives as a result of his contribution does not exceed the value of that contribution. 26 C.F.R. § 1.170A-1(h)(3)(ii); 2019 Final Rule, 84 Fed. Reg. at 27515. Accordingly, where a taxpayer contributes $10,000 to a state or local government charitable program and is permitted to take a dollar-for-dollar deduction on his state and local tax return – as opposed to a credit – the taxpayer may claim the full amount as

a charitable contribution on his federal income tax return.  See 26 C.F.R. § 1.170A-1(h)(3)(vii)(C); 2019 Final Rule, 84 Fed. Reg. at 27519.

"To provide consistent treatment for state or local tax deduction[]" programs and "state or local tax credit[] [programs] that provide a benefit that is generally equivalent to a deduction," Treasury and IRS formulated the "de minimis exception," under which it is not necessary to reduce a charitable contribution deduction premised on a state tax credit program where the tax credit does "not exceed 15 percent of the [value of a] taxpayer's payment."  2019 Final Rule, 84 Fed. Reg. at 27514, 27520; see 26 C.F.R. § 1.170A-1(h)(3)(vi).  Under the 2019 Final Rule, the 15 percent figure is calculated by "the sum of the taxpayer's state and local tax credits received."  2019 Final Rule, 84 Fed. Reg. at 27515.  This exception is "intended to reflect . . . the combined top marginal state and local tax rates, which the Treasury Department and the IRS understand currently do not exceed 15 percent."  Id. at 27520.  For example, if a taxpayer who contributes $10,000 to a state or local tax program expects a $1,000 state tax credit (equal to 10 percent of his contribution), the taxpayer may claim the full amount as a charitable contribution deduction on his federal income tax return.  See 26 C.F.R. § 1.170A-1(h)(3)(vii)(B).

The 2019 Final Rule also adopts the two safe harbors for (1) "C corporation[s] or specified passthrough entit[ies]"; and (2) certain individuals who "itemize deductions for federal income tax purposes," "make[] payment[s] to [certain entities under S]ection 170(c) in return for a [SALT] credit," and "would have been able to deduct a payment of tax to the state or local government in the amount of the credit" because the individual has a "total [SALT] liability for the year under $10,000."  2019 Final Rule, 84 Fed. Reg. at 27514; Notice 2019-12, 2019-27 I.R.B.

II.   **PROCEDURAL HISTORY**

On July 17, 2019, the Village of Scarsdale filed its Complaint against Treasury, the IRS, and certain officers of these agencies.  Scarsdale argues that the 2019 Final Rule's interpretation of "charitable contribution" in IRC § 170 is arbitrary and capricious, and contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706.  (19 Civ. 6654, Dkt. No. 1 (Cmplt.) ¶¶ 67-78)  That same day, New York, New Jersey, and Connecticut filed their Complaint against the same defendants, alleging the same violations of the APA as well as a claim under the Regulatory Flexibility Act, 5 U.S.C §§ 601-12.  (19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶¶ 112-30)  The two cases were assigned to this Court as related.  (19 Civ. 6654, July 19, 2019 Minute Entry)

On July 1, 2020, Defendants moved to dismiss both complaints, arguing that (1) Plaintiffs lack standing; (2) Plaintiffs' claims are barred by the Anti-Injunction Act, 26 U.S.C. § 7421(a); and (3) the States have not stated a claim under the Regulatory Flexibility Act.  The Government moves in the alternative for summary judgment, arguing that Plaintiffs have not demonstrated that (1) the IRS acted "in excess of [its] statutory jurisdiction," 5 U.S.C. § 706(2)(C), in promulgating the 2019 Final Rule; and (2) the IRS's interpretation of IRC § 170 is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).  (19 Civ. 6642, Dkt. No. 60 (Govt. Br.); 19 Civ. 6654, Dkt. No. 45 (Govt. Br.))[6]

That same day, Plaintiffs in both cases cross-moved for summary judgment, arguing that the 2019 Final Rule is unlawful because it (1) conflicts with IRC § 170 and

---

[6]  Because the Government's briefing in the two actions is identical, the Court cites only to the Government's briefing in 19 Civ. 6642, Dkt. Nos. 60 (Govt. Br.) and 61 (Govt. Reply).

therefore is "in excess of the IRS's statutory authority"; and (2) relies on "irrational and impermissible distinctions" that are "arbitrary and capricious," and "contrary to law." (19 Civ. 6642, Dkt. No. 58 (Pltf. Br.); 19 Civ. 6654, Dkt. No. 47 (Pltf. Br.))

## DISCUSSION

## I.   LEGAL STANDARDS

### A.   Rule 12(b)(1) Motion to Dismiss

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit ([i.e.,] subject-matter jurisdiction)." Sinochem Int'l Co. Ltd. v. Malay. Int'l Shipping Corp., 549 U.S. 422, 430-31 (2007). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).

Where subject matter jurisdiction is challenged, "[a] plaintiff has the burden of showing by a preponderance of the evidence that subject matter jurisdiction exists." Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003) (citing Makarova, 201 F.3d at 113). In considering a Rule 12(b)(1) motion, a court "must accept as true all material factual allegations in the complaint." J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004). The court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but . . . may not rely on conclusory or hearsay statements contained in the affidavits." Id.; see also Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008), aff'd, 561 U.S. 247 (2010) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) a district court may consider evidence outside the pleadings.") (citing Makarova, 201 F.3d at 113). In resolving a Rule 12(b)(1) motion, a court may also consider "any matters of which judicial notice may be taken," Hirsch v. Arthur Andersen & Co.,

72 F.3d 1085, 1092 (2d Cir. 1995), including publicly available materials, Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991).

**B.**   **Rule 12(b)(6) Motion to Dismiss**

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "[T]he court is to accept as true all facts alleged in the complaint" and must "draw all reasonable inferences in favor of the plaintiff." Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010). For a document to be incorporated by reference, "the complaint must make 'a clear, definite and substantial reference to the documents.'" Brown v. New York City Housing Auth., No. 13-CV-7599 (RJS), 2015 WL 4461558, at *2 (S.D.N.Y. July 20, 2015) (quoting Helprin v. Harcourt, Inc., 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003)).

**C.**   **Rule 56 Summary Judgment**

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only "'if it might affect the outcome of the suit under the governing law,'" and a fact issue is genuine only "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Red Tree Invs., LLC v. Petroleos de

Venezuela, S.A., 82 F.4th 161, 170 (2d Cir. 2023) (quoting Mitchell v. Shane, 350 F.3d 39, 47

(2d Cir. 2003)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities,

and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing

summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting

Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, "'[a] party may not rely on

mere speculation or conjecture as to the true nature of the facts to overcome a motion for

summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create

a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d

159, 166 (2d Cir. 2010) (second alteration and omissions in original) (quoting Fletcher v. Atex,

Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

Where, as here, a district court is tasked with reviewing agency action under the

APA, the "'entire case on review is a question of law,' such that 'judicial review of agency

action is often accomplished by filing cross-motions for summary judgment.'" Gomez v.

McHenry, No. 19 Civ. 7373 (JPO), 2020 WL 6381959, at *2 (S.D.N.Y. Oct. 30, 2020) (quoting

Just Bagels Mfg., Inc. v. Mayorkas, 900 F. Supp. 2d 363, 372 (S.D.N.Y. 2012)); see also

Residents for Sane Trash Sols., Inc. v. U.S. Army Corps of Engineers, 31 F. Supp. 3d 571, 586

(S.D.N.Y. 2014) ("'Whether an agency action is supported by the administrative record and

consistent with the APA standard of review' is decided 'as a matter of law.'") (quoting UPMC

Mercy v. Sebelius, 793 F. Supp. 2d 62, 67 (D.D.C. 2011)).  In deciding such a case, the district

court assumes an appellate role and must "decide, as a matter of law, whether the agency action

is supported by the administrative record and otherwise consistent with the APA standard of

review." <u>Gomez</u>, 2020 WL 6381959, at *2 (quoting <u>Zevallos v. Obama</u>, 10 F. Supp. 3d 111, 117 (D.D.C. 2014)).

**II.**   **ANALYSIS**

    **A.**   **Motions to Dismiss**

In seeking dismissal of Plaintiffs' actions, the Government argues that (1) Plaintiffs lack standing to pursue their claims; (2) the Anti-Injunction Act bars their actions; and (3) Plaintiff States' claims that Treasury and the IRS violated the Regulatory Flexibility Act must be dismissed for failure to state a claim.  (19 Civ. 6642, Dkt. No. 60 (Govt. Br.) at 26-42)

        **1.**   **Whether Plaintiffs Have Pled An Injury**
           **In Fact Sufficient to Demonstrate Standing**

The Government argues that Plaintiffs cannot prove that they have suffered, or will suffer, an injury in fact that is fairly traceable to the 2019 Final Rule.

      **a.**   **Applicable Law**

To establish the "'irreducible constitutional minimum' of standing," a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 338 (2016) (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992)).  Here, the Government contends that Plaintiffs have not demonstrated either an injury in fact or causation.

As to states, courts have found an injury in fact in three circumstances:  (1) "proprietary suits in which the State sues much like a private party suffering a direct, tangible injury," for example, a monetary loss, <u>Connecticut v. Cahill</u>, 217 F.3d 93, 97 (2d Cir. 2000); (2) "sovereignty suits requesting adjudication of boundary disputes or water rights," <u>id.</u>, or "the power to create and enforce a legal code," <u>Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel.</u>

Barez, 458 U.S. 592, 601 (1982); and (3) "parens patriae suits in which States litigate to protect

'quasi-sovereign' interests.'" Cahill, 217 F.3d at 97 (citing Snapp, 458 U.S. at 601-02).

      If directly impacted by the 2019 Final Rule, Plaintiff States and Plaintiff

Scarsdale, "no less than private citizens, are entitled to invoke [their direct injury] in

demonstrating their standing to sue." State of New York v. Mnuchin, 408 F. Supp. 3d 399, 409

(S.D.N.Y. 2019); see Wyoming v. Oklahoma, 502 U.S. 437, 448-49 (1992) (finding standing

based on "allegations of direct injury to the State [revenues]").

### b.    Plaintiffs' Alleged Injury

      Here, the Plaintiff States have alleged that the 2019 Final Rule implicates all three

categories of injury:

- "a sovereign and proprietary interest in protecting a net increase in state revenue that would strengthen the Plaintiff States' fiscal health and their capacity to carry out their sovereign functions" (19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶ 107);

- "a proprietary, sovereign, and quasi-sovereign interest in protecting the charitable revenue streams that flow to State institutions and other charitable organizations. . . . [B]y diminishing the value of charitable deductions, the Final Rule reduces the incentive to itemize, which in turn weakens the incentive to make charitable contributions," (id. ¶ 108); and

- "an interest in protecting a net increase in revenue for their governmental subdivisions, including counties, municipalities, and school districts," (id. ¶ 109).

      Plaintiff Village of Scarsdale alleges that the 2019 Final Rule has caused it injury

by "reducing the amount of revenue collected by the Village." (19 Civ. 6654, Dkt. No. 47 (Pltf.

Br.) at 18; see id. ("[T]he Final Rule makes it more expensive for Scarsdale residents to

contribute to the Scarsdale Fund, leading to a corresponding decline in contributions and,

accordingly, Scarsdale's overall revenue."))

New York v. Yellen, 15 F.4th 569 (2d Cir. 2021) is instructive regarding Plaintiffs' claim that the 2019 Final Rule's impact on their revenue is sufficient to demonstrate standing.

In Yellen, New York, New Jersey, Connecticut, and Maryland sued the same parties that are defendants here, arguing that the 2017 Tax Act – which capped the SALT deduction – was "unconstitutional on its face or unconstitutionally coerces them to abandon their preferred fiscal policies." Yellen, 15 F.4th at 572. The plaintiff states alleged that the SALT deduction cap in the 2017 Tax Act would "cause them to lose at least hundreds of millions of dollars of revenue from property taxes and real estate transfer taxes." Id. at 576. Because the SALT deduction cap "prohibits taxpayers from deducting the full amount of their property taxes," it "makes homeownership more expensive for taxpayers whose [SALT] liability exceeds $10,000." Id. As a result, the SALT deduction cap "reduces demand in the housing market" in the plaintiff states, decreases the value of real estate, and thus causes "specific losses in tax revenue derived from property and real estate transfer taxes." Id.

In Yellen, New York alleged that the 2017 Tax Act "would cause [its] real estate transfer tax revenue to decrease by $15.3 million in 2019 and $69.2 million in 2020." Id. at 577. New Jersey forecast "that the 2017 Tax Act would cause [its] real estate transfer tax revenue to decrease by a total of $105.1 million in 2019 and 2020." Id.

The Yellen court concluded that the states' "allegations that the [SALT deduction] cap will decrease the frequency and price at which taxable real estate transactions occur by measurably increasing the cost of those transactions reflect specific lost tax revenues and suffice to support standing." Id. at 577. In reaching this result, the Yellen court found that

> the [p]laintiff [s]tates, which claim that the new tax burden will significantly
> decrease the tax revenue from residents, are not engaged in "pure speculation and

fantasy," Lujan, 504 U.S. at 567.  Far from "guesswork as to how independent decisionmakers" – their own residents – "will exercise their judgment," Clapper v. Amnesty Int'l USA, 568 U.S. 398, 413 (2013), the chain of economic events that the [p]laintiff [s]tates have proffered in this case strikes us as realistic, and the challenged action's effect on their residents' decisions seems to us entirely "predictable," Dep't of Commerce v. New York, 139 S. Ct. 2551, 2566 (2019).

Id.

In sum, under Yellen, a state has standing to challenge a law when it establishes "'a direct [proprietary] injury,'" for example, "'a loss of specific tax revenues,'" and does not merely point to "generalized economic harm" to a source of revenue that might be affected by a federal regulation.  Id. at 576 (quoting Oklahoma, 502 U.S. at 447-48); see also XY Planning Network, LLC v. United States Sec. & Exch. Comm'n, 963 F.3d 244, 252 (2d Cir. 2020) ("A 'fairly direct link' is required because 'the unavoidable economic repercussions of virtually all federal policies . . . suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing.'") (quoting Pennsylvania v. Kleppe, 533 F.2d 668, 672 (D.C. Cir. 1976)).

### i.   **New York and Scarsdale**

New York and Scarsdale have alleged that the 2019 Final Rule has caused – and will continue to cause – the loss of millions of dollars of revenue.  Before the 2019 Final Rule, Plaintiffs' tax credit programs incentivized "taxpayers to donate to state and local charitable fund[s]," resulting in "a direct benefit" to Plaintiffs.  (19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶¶ 97, 102, 106; see also 19 Civ. 6654, Dkt. No. 1 (Cmplt.) ¶ 23)  Because the charitable funds sponsored by New York and Scarsdale offer taxpayers a tax credit ranging from 85 to 95 percent, the remaining amount collected "generate[s] a net increase in state and local government revenue," which Plaintiffs "can in turn spend on vital services for [their] residents."  (19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶¶ 98, 102, 106; see also 19 Civ. 6654, Dkt. No. 1 (Cmplt.) ¶ 23)

Because the 2019 Final Rule prevents taxpayers from deducting the contributions they make to New York and Scarsdale's sponsored funds, taxpayers are less likely to donate to these funds.  (19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶¶ 104-06)  With decreased contributions, New York and Scarsdale have "lost donations that otherwise would have been made to [their sponsored funds,] and will continue to lose such donations going forward," thereby diminishing their revenue.  (Id., Dkt. No. 58-2 (Pltf. Br., Ex. B) (Palladino Decl.) ¶¶ 6, 14)

Before the new rule was proposed on August 27, 2018, the New York tax credit program – which funds health care and education services – received $78.7 million in donations. (Id. ¶¶ 8, 15)  Because New York retains 15 percent of these contributions, it realized as much as $11.8 million in revenue.  (Id., Dkt. No. 58-1 (Pltf. Br., Ex. A) (Rodolakis Decl.) ¶ 12)  This revenue constituted a "net increase in the amount of state-controlled funds" used for "public purposes," such as health care and education.  (Id. ¶ 11)

But the "Final Rule undermines the incentive for taxpayers to donate" to New York's tax credit program (id., Dkt. No. 8 (Cmplt.) ¶¶ 105-06), and during the period between August 28, 2018 and December 20, 2019 – after the Government issued the 2018 Proposed Rule – New York's tax credit program received a small fraction of previous donations – approximately $13.7 million in 2018, and $25,416 in 2019.  (Id., Dkt. No. 58-2 (Pltf. Br., Ex. B) (Palladino Decl.) ¶ 15)  These donations generated approximately $2.07 million in additional state revenue, reflecting a revenue loss of millions of dollars.  (See id.; see also id., Dkt. No. 8 (Cmplt.) ¶ 106 ("The direct consequence of the Final Rule is less money in state and local government coffers."))

Scarsdale likewise alleges that the 2019 Final Rule removes an incentive for taxpayers to contribute to its tax credit program, and has thereby caused a reduction in the

amount of revenue that Scarsdale collects.  (19 Civ. 6654, Dkt. No. 1 (Cmplt.) ¶¶ 63-64

(claiming that the 2019 Final Rule "depriv[ed Scarsdale] . . . of the 5% of non-creditable

contributions that it would have otherwise received"))  In 2018, before the 2019 Final Rule was

promulgated, Scarsdale's tax credit program "received over $500,000 in . . . contributions, of

which approximately $25,000, or five percent[,] . . . was appropriated to the Village [of

Scarsdale]'s 2019/2020 budget."  (Id., Dkt. No. 47-1 (Pltf. Br., Ex. A) (McClure Decl.) ¶ 12; id.,

Dkt. No. 1 (Cmplt.) ¶ 63 ("$25,000, or five percent of [the 2018] contributions, was made

available to Scarsdale for use as it saw fit for its residents, including for the administration of its

charitable gifts reserve fund"))  "Since August 27, 2018," when the Government issued the 2018

Proposed Rule, "no further contributions to [Scarsdale's charitable gifts reserve fund] have been

made," even though the fund remained open until January 13, 2020.  (Id., Dkt. No. 47-1 (Pltf.

Br., Ex. A) (McClure Decl.) ¶¶ 13-14; see id., Dkt. No. 1 (Cmplt.) ¶ 63)

       The Court concludes that New York and Scarsdale have identified injuries that are

sufficiently concrete and particularized, and actual or imminent, to support standing.  See Lujan,

504 U.S. at 560-61.  "[A] probability of 'some financial injury' is sufficient to establish

standing," Mnuchin, 408 F. Supp. 3d at 409 (quoting Food Mktg. Inst. v. Argus Leader Media,

**588 U.S. --,** 139 S. Ct. 2356, 2362 (2019)) (emphasis in original), and here New York and

Scarsdale have shown a "direct injury" to their revenue, Yellen, 15 F.4th at 576, and articulated

"a fairly direct link between [their] status as . . . collector[s] and recipient[s] of revenues and the

[2019 Final Rule] being challenged." New York v. Scalia, 464 F. Supp. 3d 528, 542 (S.D.N.Y.

2020) (citing New York v. U.S. Dep't of Labor, 363 F. Supp. 3d 109, 125 (D.D.C. 2019)).[7]

---

[7] It is worth noting that, in the 2019 Final Rule, the Government acknowledges that the Final
Rule "may . . . marginally reduce the incentive to make contributions to charitable organizations

### ii.   New Jersey and Connecticut

New Jersey and Connecticut also allege that the 2019 Final Rule caused them economic harm.  (19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶¶ 107-10; id., Dkt. No. 58 (Pltf. Br.) at 17-19)  Unlike New York and Scarsdale, however, New Jersey and Connecticut never established tax credit programs.

The States' Complaint alleges that New Jersey and Connecticut "enacted legislation" establishing tax credit programs (id., Dkt. No. 8 (Cmplt.) ¶¶ 99-100), and town officials in both states submitted declarations stating that they had "began exploring a charitable tax credit program as a legal remedy for [their] taxpayers" "[a]fter the SALT cap was instituted." (Id., Dkt. No. 58-3 (Pltf. Br., Ex. C) (Dafis Decl.) ¶¶ 3-4, 12; see also id., Dkt. No. 58-4 (Pltf. Br., Ex. D) (Marconi Decl.) ¶¶ 4-5, 15)  "Due in large measure to the IRS's Notice and Proposed Rule," the municipalities "elected not to move forward" with their "efforts to institute a charitable tax credit program."  (Id., Dkt. No. 58-3 (Pltf. Br., Ex. C) (Dafis Decl.) ¶ 15; see also id., Dkt. No. 58-4 (Pltf. Br., Ex. D) (Marconi Decl.) ¶¶ 18, 20)

While New Jersey and Connecticut argue that the 2019 Final Rule "prevented [their state-sponsored] funds from getting off the ground" – thus "depriving . . . the States of the increase in funds they expected to gain [at some point in the future]" (id., Dkt. No. 58 (Pltf. Br.) at 18-19, 23) – such a "highly attenuated chain of possibilities" and "speculative chain of events" is not sufficient to establish standing.  Clapper v. Amnesty Int'l USA, 568 U.S. 398, 410, 414

---

that result in state and local tax credits, which may have the effect of reducing aggregate contributions."  2019 Final Rule, 84 Fed. Reg. at 27524; 2018 Proposed Rule, 83 Fed. Reg. at 43569 (requesting "comments as to how the proposed regulations might alter incentives regarding contributions to [SALT] credit programs").

(2013).  New Jersey and Connecticut cannot claim injury to their revenue based on potential tax credit programs that were never established.

New Jersey and Connecticut also argue that they have standing based on the 2019 Final Rule's interference with their "sovereign" interest in creating and enforcing their tax codes. (19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶¶ 107-08, 110; id., Dkt. No. 62 (Pltf. Reply) at 10 ("The [2019] Final Rule has . . . effectively subverted the purpose of the Plaintiff States' charitable tax credit programs."))

While the 2019 Final Rule acknowledges that it was promulgated in response to "[e]fforts by states and taxpayers to devise alternate means for [residents to] deduct[] the disallowed portion of their state and local taxes," 84 Fed. Reg. at 27527, the 2019 Final Rule leaves to state and local governments the decision whether to establish or continue such tax credit programs.  See, e.g., id. at 27522 ("[S]tate and local governments have the ability to change the parameters, including the aggregate dollar amount of credits, of [their existing] programs.").  Moreover, the 2019 Final Rule is directed at taxpayers – and not at state and local governments – and addresses a Federal issue – whether a certain type of charitable contribution may be deducted on a taxpayer's federal tax return.  See, e.g., id. at 27514 (noting that the Final Rule addresses "taxpayer[s] [who] receive[] . . . a state or local tax credit in return for [their charitable] payment [to a state tax credit program]."  In sum, the 2019 Final Rule does not "require the states to do or yield anything."  Massachusetts v. Mellon, 262 U.S. 447, 482 (1923).

New Jersey and Connecticut also contend that they have standing based on the 2019 Final Rule's alleged interference with their quasi-sovereign interests as parens patriae of

their residents.[8]  (19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶¶ 108-10)  While "quasi-sovereign

interests" are not easily defined, a State may have <u>parens patriae</u> standing if it alleges "injury to a

sufficiently substantial segment of its population," "an interest apart from the interests of

particular parties," and "a quasi-sovereign interest in the health and well-being – both physical

and economic – of its residents in general."  <u>Snapp</u>, 458 U.S. at 607-08; <u>see also State of W. Va.</u>

<u>v. Chas. Pfizer & Co.</u>, 440 F.2d 1079, 1089 (2d Cir. 1971) ("These quasi-sovereign interests

have included the 'health, comfort, and welfare' of the people . . . and the general economy of

the state.").  "The doctrine of <u>parens patriae</u> derives from the common-law principle that a

sovereign, as 'parent of the country,' may step in on behalf of its citizens to prevent 'injury to

those who cannot protect themselves.'"  <u>Connecticut v. Physicians Health Servs. Of Connecticut,</u>

<u>Inc.</u>, 287 F.3d 110, 119 (2d Cir. 2002) (quoting <u>Snapp</u>, 458 U.S. at 600).

      The States' Complaint alleges that the 2019 Final Rule harms the States, however,

and not their citizens.  (<u>See</u> 19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶ 108 (asserting that the 2019

Final Rule "will harm the Plaintiff States themselves by reducing the flow of contributions to

state colleges and universities and their affiliated charitable foundations"); <u>id.</u> ¶ 106 ("The Final

Rule thus undermines the incentive for taxpayers to donate to state . . . charitable funds that

generate a net increase in state . . . government revenues.  The direct consequence of the Final

Rule is less money in state and local government coffers."); <u>id.</u> ¶ 104 ("[T]he Final Rule will

---

[8]  It is far from clear that a State may invoke its <u>parens patriae</u> standing against the Federal government, because "[i]n that field, it is the United States, and not the State, which represents [citizens] as <u>parens patriae</u>."  <u>Massachusetts v. Mellon</u>, 262 U.S. 447, 486 (1923); <u>see also</u> <u>Snapp</u>, 458 U.S. at 609 n.16 ("A State does not have standing as <u>parens patriae</u> to bring an action against the Federal Government.").  As discussed below, the Court concludes that – even if New Jersey and Connecticut, in their capacity as sovereigns, could invoke <u>parens patrie</u> standing against agencies and officials of the Federal government – the States' Complaint does not allege facts sufficient to demonstrate a cognizable harm suffered by New Jersey and Connecticut citizens.

directly reduce the funds available to the recipient governments."); id. ¶¶ 102-03 (alleging that

tax credit programs provide "a direct benefit for the recipient governmental entity," and that

"[t]he Final Rule would . . . reduc[e] the monies available to [state] government[s] to spend on

vital services"); id. ¶ 109 (alleging that "the Plaintiff States have an interest in protecting a net

increase in revenue"))

        In sum, while the States' Complaint alleges that the 2019 Final Rule causes injury

to the States, New Jersey and Connecticut have not pled facts demonstrating that their citizens

have suffered an injury, nor have they invoked the rights of their citizens.  See Lacewell v. Off.

of Comptroller of Currency, 999 F.3d 130, 142 n.13 (2d Cir. 2021) ("'[A]s a matter of logic, it is

clear enough that the mere assertion of a state interest, untethered from injury to the State's

citizens, cannot support parens patriae standing – even if that interest might qualify as a quasi-

sovereign interest if accompanied by such injury.'") (quoting Utah Div. of Consumer Prot. v.

Stevens, 398 F. Supp. 3d 1139, 1145 (D. Utah 2019)); Com. of Puerto Rico ex rel. Quiros v.

Bramkamp, 654 F.2d 212, 215 (2d Cir. 1981) ("The asserted quasi-sovereign interests will be

deemed sufficiently implicated to support parens patriae standing only if 'the injury alleged

affects the general population of a State in a substantial way.'") (quoting Maryland, et al. v.

Louisiana, 451 U.S. 725, 728 (1981)).

        The Court concludes that New Jersey and Connecticut have not demonstrated that

they have standing to pursue their claims.  Accordingly, the Government's motion to dismiss

their claims on standing grounds will be granted.

c.     **Government Arguments that New York
and Scarsdale Do Not Have Standing**

i.     **Injury**

The Government contends that New York and Scarsdale have not identified the

sort of injury necessary to confer standing (19 Civ. 6642, Dkt. No. 61 (Govt. Reply) at 13-17; see

also 19 Civ. 6654, Dkt. No. 56 (Govt. Oct. 20, 2021 Ltr.) at 1-2), and have alleged nothing more

than a "general decrease in a source of state revenue," as opposed to "a quantified decrease in a

specific stream of tax revenues."  (19 Civ. 6642, Dkt. No. 61 (Govt. Reply) at 13, 14 n.6)

The Government relies on Wyoming v. Dep't of Interior, 674 F.3d 1220 (10th

Cir. 2012), in which the Tenth Circuit held that Wyoming did not have standing to challenge a

rule promulgated by the National Park Service – an agency of the Department of the Interior –

limiting the use of snowmobiles in a national park.  Wyoming, 674 F.3d at 1231-35.  As to

injury, Wyoming alleged that "each snowmobile entry into the parks corresponds to tax

revenues," and limiting snowmobile use would reduce state sales tax revenue.  Id. at 1231.  But

the state "presented no concrete evidence" that the National Park Service's rule limiting

snowmobile entries "corresponded to decreased tax collection."  Id. at 1233-34.  Given the

"conclusory statements and speculative economic data" offered by Wyoming concerning the

long-term effects of the rule on the state budget, the Tenth Circuit concluded that Wyoming had

not shown an injury that provided it with standing.  Id.

The result in Wyoming is fully consistent with well settled law requiring that an

injury supporting standing must be both "'actual and imminent, [and] not conjectural or

hypothetical.'"  Lujan, 504 U.S. at 560 (quoting Whitmore v. Arkansas, 495 U.S. 149, 155

(1990)).

26

Here, the injuries alleged by New York and Scarsdale are "actual and imminent." As discussed above, New York and Scarsdale have pled allegations demonstrating that they derive significant revenue from contributions made to their tax credit programs, and as a direct result of the 2018 Proposed Rule and the 2019 Final Rule, they have already lost millions of dollars in revenue.[9] See Hedges v. Obama, 724 F.3d 170, 188 (2d Cir. 2013) ("Actual injury-in-fact exists when a defendant's actions have inflicted a concrete, present harm on the plaintiff."); New York v. United States Dep't of Labor, 477 F. Supp. 3d 1, 8 (S.D.N.Y. 2020) (allegations regarding a state's "shrinking" income tax base constitute a "specific and imminently threatened diminution of an identifiable source of tax revenue").

And contrary to the Government's arguments, Plaintiffs are not required to demonstrate a "substantial" or "drastic[]" loss in revenue.  (See 19 Civ. 6642, Dkt. No. 60 (Govt. Br.) at 32, 34)  "[B]ecause even an 'identifiable trifle' suffices to demonstrate standing," it is sufficient for Plaintiffs to show that they have or will be injured.  New York, 477 F. Supp. 3d at 8 (quoting United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 689 n.14 (1973)).  Plaintiffs are not required to plead "the magnitude of [their] injury."  Id.

### ii.   Causation

As to causation, the Government argues that New York and Scarsdale are not directly affected by the 2019 Final Rule, and that any injury arising from the Rule would be felt by "individual taxpayers" seeking to "deduct [charitable contributions] on their federal tax

---

[9]  The Government argues that the revenue Scarsdale collected from its charitable contribution program was offset by the "administrative costs of operating [its] charitable fund[]."  (19 Civ. 6642, Dkt. No. 60 (Govt. Br.) at 32)  But Scarsdale has offered evidence that, in 2018, it received $25,000 through its charitable reserve fund and incurred expenses of approximately $3,350, resulting in net revenue of $21,650.  (19 Civ. 6654, Dkt. No. 47-1 (Pltf. Br., Ex. A) (McClure Decl.) ¶¶ 11, 12; id., Dkt. No. 47 (Pltf. Br.) at 19 ("Scarsdale received charitable gifts in 2018 that far exceeded its administrative costs."))

returns." (19 Civ. 6642, Dkt. No. 60 (Govt. Br.) at 33-34; id., Dkt. No. 61 (Govt. Reply) at 9-10)
As discussed above, however, New York and Scarsdale have proffered economic consequences
to their own respective revenues resulting from the Proposed Rule and the 2019 Final Rule. (See
id., Dkt. No. 8 (Cmplt.) ¶ 106 ("The direct consequence of the Final Rule is less money in state
and local government coffers."); id. ¶ 103 ("The Final Rule would . . . reduc[e] the monies
available to [state or local] government to spend on vital services."); id. ¶ 104 ("[T]he Final Rule
will directly reduce the funds available to the recipient governments."); 19 Civ. 6654, Dkt. No. 1
(Cmplt.) ¶ 63 (alleging that the 2019 Final Rule "depriv[ed] Scarsdale of the 5 [percent] of non-
credible contributions that it would have otherwise received"))

   The Government argues, however, that Plaintiffs have not demonstrated that it
was the 2019 Final Rule, as opposed to other variables, that drove their loss in revenue. The
Government asserts, for example, that the Scarsdale fund stopped accepting contributions on
August 1, 2018, "before the Regulation's effective date." (19 Civ. 6642, Dkt. No. 60 (Govt. Br.)
at 31-32) But Scarsdale has offered evidence that its fund remained open until January 2020,
and only shut down because all contributions ended in August 2018 when the 2018 Proposed
Rule was announced. (19 Civ. 6654, Dkt. No. 47-1 (Pltf. Br., Ex. A) (McClure Decl.) ¶¶ 13-14
(stating that Scarsdale's fund "was closed during the week of January 13, 2020 to reduce costs
associated with maintaining the account," given the absence of contributions)) In the event that a
Scarsdale resident wished to "make a contribution," Scarsdale would "reopen[] [a bank account]
to accept the contribution" (id. ¶ 14), but "no further contributions to the [Scarsdale f]und have
been made [since August 2018 when the Proposed Rule was announced]." (Id. ¶ 13) In any
event, it is undisputed here that charitable contributions to the New York and Scarsdale funds
precipitously declined with the announcement of the 2018 Proposed Rule. (Id.; 19 Civ. 6642,

Dkt. No. 58-2 (Pltf. Br., Ex. B) (Palladino Decl.) ¶ 15 ("Immediately following [the issuance of the 2018 Proposed Rule], contributions to [New York's f]und sharply decreased."))  Finally, in the event that the 2019 Final Rule was overturned, it is likely that the charitable contributions to New York and Scarsdale – and the resulting state and local revenue – would resume.

*     *     *     *

The Court concludes that New York and Scarsdale have demonstrated an injury in fact and causation, and that their alleged injury is redressable.  Accordingly, they have standing to challenge the 2019 Final Rule.

### 2.   <u>Whether Plaintiffs' Actions Are Barred by the Anti-Injunction Act</u>

The Government also argues that Plaintiffs' actions must be dismissed as barred by the Anti-Injunction Act (the "AIA").  The AIA provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed."  26 U.S.C. § 7421(a).  An aggrieved taxpayer whose claims are barred in an Article III court by the AIA may challenge a tax assessment by (1) paying the tax and filing a refund claim, <u>see</u> 26 U.S.C. §§ 6532, 7422; or (2) challenging the deficiency in Tax Court.  <u>See id.</u> §§ 6212, 6213; <u>see also</u> <u>South Carolina v. Regan</u>, 465 U.S. 367, 379-81 (1984).

The Government argues that Plaintiffs have challenged the validity of a regulation concerning taxpayers' federal tax liability, and accordingly the AIA "bars this Court from hearing Plaintiffs' [claims]."  (19 Civ. 6642, Dkt. No. 60 (Govt. Br.) at 35-40)

Plaintiffs respond that in <u>South Carolina v. Regan</u>, 465 U.S. 367 (1984), the Supreme Court outlined an exception to the AIA that applies here.  (<u>See id.</u>, Dkt. No. 58 (Pltf. Br.) at 25-31; 19 Civ. 6654, Dkt. No. 47 (Pltf. Br.) at 23-30)

In <u>South Carolina v. Regan</u>, South Carolina challenged the Tax Equity and Fiscal Responsibility Act of 1982 (the "Tax Equity Act"), which taxed interest earned on state-issued, unregistered bearer bonds. <u>Regan</u>, 465 U.S. at 370-72. South Carolina claimed that the Tax Equity Act violated the doctrine of intergovernmental tax immunity and the Tenth Amendment. <u>See</u> <u>id.</u> at 367. Because South Carolina itself did not owe tax on any such bonds, it could not avail itself of "any statutory [alternatives] to contest" the relevant provision. <u>Id.</u> at 380. Accordingly, if South Carolina's suit was barred by the AIA, it would have to "'find [a resident] willing to subject himself to the rigors of litigation . . . and then [would have to] rely on him to present the relevant arguments on its behalf.'" <u>Id.</u> (quoting <u>Bob Jones University v. United States</u>, 461 U.S. 574, 596 (1983)) (alterations accepted). Because it was "by no means certain that the State would be able to convince a taxpayer to raise its claims," and because "Congress ha[d] not provided the [State] with an alternative legal way to challenge the validity of a tax," the Supreme Court concluded that the AIA did not bar South Carolina's claim. <u>Id.</u> at 373, 380-81.

In applying <u>Regan</u>, the Second Circuit has instructed that the AIA does not apply where

> the [p]laintiff [s]tates cannot assert their claims in a forum other than federal court and cannot themselves bring a refund suit here. Moreover, as <u>Regan</u> reminds us, the AIA applies "only when Congress has provided an alternative avenue for an aggrieved party to litigate its claims <u>on its own behalf</u>." <u>Regan</u>, 465 U.S. at 381 (emphasis added). Aggrieved parties are not obliged to find taxpayers willing to litigate their claims and trust that those taxpayers will litigate them effectively. <u>Id.</u> at 380.

<u>Yellen</u>, 15 F.4th at 578.

Here, because Plaintiffs "incur no tax liability" under the 2019 Final Rule, they cannot bring a refund suit or "utilize any statutory procedure to contest" the 2019 Final Rule. <u>Regan</u>, 465 U.S. at 379-80. They thus would have no alternative path to judicial review were this Court to find that the AIA bars their claims. But given Plaintiffs' claim that the 2019 Final

Rule injures their proprietary rights, Plaintiffs "must be permitted to pursue their claims on their own behalf." Yellen, 15 F.4th at 578.  For these reasons, this Court concludes that the AIA does not bar Plaintiffs' claims.

The Government argues, however, that Regan applies "only when states bring constitutional challenges to provisions of the Internal Revenue Code based on their unique sovereign interests," and not where a state brings an "APA challenge to an IRS regulation," which "could be part of a post-payment challenge by any individual taxpayer."  (19 Civ. 6642, Dkt. No. 60 (Govt. Br.) at 37-38) (emphasis in original)

While Regan "involve[d] the constitutionality" of the Tax Equity Act, see Regan, 465 U.S. at 378 n.17, the Supreme Court's holding with respect to the AIA extends to all "actions brought by aggrieved parties, such as [states], for whom Congress has not provided an alternative forum in which to litigate their claims." Id. at 367.  In using the term "actions," the Regan court does not distinguish between constitutional challenges and claims that agency action is arbitrary and capricious and contrary to law under the APA.  See id. at 394-95 (O'Connor, J., concurring in judgment) (noting that majority opinion authorizes non-taxpayers with no other remedies to "challenge both Congress' tax statutes and the Internal Revenue Service's regulations").  Accordingly, the Court concludes that Regan is not restricted to constitutional claims.

The Government also argues that "individual taxpayers are themselves far more directly affected [by the 2019 Final Rule than Plaintiffs], and thus have every incentive to bring a challenge through the procedures established by Congress."  (19 Civ. 6642, Dkt. No. 60 (Govt. Br.) at 38-40)  But because Plaintiffs are not seeking to vindicate the rights of individual taxpayers, it is irrelevant that taxpayers can seek a refund or pursue a Tax Court action.

Plaintiffs seek to invalidate the 2019 Final Rule because it reduces their own revenue – a direct, proprietary injury – distinct from their residents' rights.[10]  Moreover, "[t]here is no guarantee that [a taxpayer] willing to challenge the disputed tax will 'present the relevant arguments on [Plaintiffs'] behalf,' as opposed to arguments that highlight the taxpayer's more individual interest."  Yellen, 15 F.4th at 578.

The Court concludes that, under Regan and its progeny, the AIA does not bar Plaintiffs' claims.[11]  Accordingly, the Government's motions to dismiss are denied to the extent that they are predicated on the AIA.

### 3.    Whether the States Have Pled a Violation of the Regulatory Flexibility Act

The Government seeks dismissal of the States' claim that the 2019 Final Rule violates the Regulatory Flexibility Act "'[b]y failing to assess the fiscal impact on small governmental jurisdictions.'"  (19 Civ. 6642, Dkt. No. 60 (Govt. Br.) at 40-42 (quoting id., Dkt. No. 8 (Cmplt.) ¶ 126))

The Regulatory Flexibility Act (the "RFA") requires agencies issuing a notice of proposed rulemaking to "prepare and make available for public comment an initial regulatory

---

[10]  Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol & Tobacco Tax & Trade Bureau, 843 F.3d 810 (9th Cir. 2016), and RYO Machine, LLC v. United States Dep't of Treasury, 696 F.3d 467 (6th Cir. 2012) – cited by the Government (19 Civ. 6642, Dkt. No. 60 (Govt. Br.) at 38-39) are not on point.  In Confederated Tribes, the Native American tribe's "asserted injury . . . [was] wholly derivative" of the injuries allegedly suffered by individual taxpayers, who jointly litigated the case with the tribe.  Confederated Tribes, 843 F.3d at 815. And in RYO Machine, a manufacturer sued Treasury in order "to preserve the position of [its] customers."  RYO Machine, 696 F.3d at 472.

[11]  Given this ruling, the Court does not reach Plaintiffs' argument that the AIA is inapplicable because Plaintiffs are not seeking to restrain the assessment or collection of tax.  (See 19 Civ. 6642, Dkt. No. 58 (Pltf. Br.) at 25-27; 19 Civ. 6654, Dkt. No. 47 (Pltf. Br.) at 23-26; id., Dkt. No. 53 (Pltf. May 5, 2021 Supplemental Ltr.))

flexibility analysis . . . [that] describe[s] the impact of the proposed rule on small entities,"

including "small business[es]," "small organization[s]," and "small governmental

jurisdiction[s]." 5 U.S.C. §§ 603(a), 601(6).  Moreover, an agency promulgating a final rule

must "prepare a final regulatory flexibility analysis" that describes "a statement of the significant

issues raised by the public comments in response to the initial regulatory flexibility analysis, a

statement of the assessment of the agency of such issues," and "the steps the agency has taken to

minimize the significant economic impact on small entities."  Id. § 604(a).

      However, these analyses are not required if the agency "certifies that the rule will

not, if promulgated, have a significant economic impact on a substantial number of small

entities."  Id. § 605(b); Dovid v. U.S. Dep't of Agric., No. 11 Civ. 2746 (PAC), 2013 WL

775408, at *9 (S.D.N.Y. Mar. 1, 2013) ("If the head of the agency certifies that the rule will not

affect small entities, however, then the requirements are not applicable."); accord Michigan v.

Env't Prot. Agency, 213 F.3d 663, 689 (D.C. Cir. 2000) (agencies have "'no obligation to

conduct a small entity impact analysis of effects on entities which it does not regulate'") (quoting

Motor & Equip. Mfrs. Ass'n v. Nichols, 142 F.3d 449, 467 (D.C. Cir. 1998)) (collecting cases).

      Here, Treasury and the IRS certified that the 2019 Final Rule will not have a

significant economic impact on small entities.  2018 Proposed Rule, 83 Fed. Reg. at 43570 ("The

Regulatory Flexibility Act . . . does not apply because the proposed regulations primarily affect

individuals and do not impose costs, including a collection of information, on small entities.

Therefore, a regulatory flexibility analysis is not required."); 2019 Final Rule, 84 Fed. Reg. at

27521 (rejecting comments recommending an RFA analysis because "small governmental

jurisdictions that receive deductible contributions as part of a state or local tax credit program are

not subject to the proposed regulations, and any potential effect on contributions to these organizations is an indirect effect of the regulation").

The Plaintiff States argue, however, that the certification issued by Treasury and the IRS violates the RFA, because the 2019 Final Rule regulates small governmental jurisdictions such as Scarsdale, as well as the charitable funds local governments operate.  (See generally 19 Civ. 6642, Dkt. No. 8 (Cmplt.) ¶¶ 125-130; see also id., Dkt. No. 58 (Pltf. Br.) at 49-52)  While the 2019 Final Rule is "'immediately addressed' to taxpayers," the "economic impact falls squarely on the state and local governments' charitable funds," which will receive fewer contributions as a result of the Final Rule.  (Id., Dkt. No. 58 (Pltf. Br.) at 50 (quoting Aeronautical Repair Station Association, Inc. v. F.A.A., 494 F.3d 161, 177 (D.C. Cir. 2007))

The Court disagrees.  The 2019 Final Rule does not directly regulate local governments and their charity funds, but instead addresses individual taxpayers who contribute to local government charity funds.  Compare 26 C.F.R. § 1.170A-1(h)(3)(i) (regulating "the amount of the taxpayer's charitable contribution deduction" resulting in state or local tax benefits) and 2019 Final Rule, 84 Fed. Reg. at 27529 ("[T]he regulations primarily affect individuals.") with id. at 27530 ("This final rule . . . does not impose substantial direct compliance costs on state and local governments.") and id. at 27529 ("There is no collection of information requirement on small entities.").  While the tax credit programs operated by Scarsdale and other municipalities are economically impacted by the Final Rule, they are not "'subject to the . . . regulation.'"  Saget v. Trump, 375 F. Supp. 3d 280, 338 (E.D.N.Y. 2019) (quoting Mid-Tex Elec. Coop. v. FERC, 773 F.2d 327, 342 (D.C. Cir. 1985) (emphasis in Saget).

Accordingly, Treasury and the IRS did not violate the RFA by failing to conduct an analysis of the effect that the 2019 Final Rule would have on Scarsdale and other local

municipalities, and the charity funds they operate. The Government's motion to dismiss is granted as to Plaintiff States' claim under the Regulatory Flexibility Act.

### B.   Cross-Motions for Summary Judgment on Plaintiffs' Claim that the 2019 Final Rule Violates the Administrative Procedure Act

Under the Administrative Procedure Act (the "APA"), a district court may review "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. The APA directs courts to "hold unlawful and set aside agency action, findings, and conclusions" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

Here, Plaintiffs raise two challenges to the 2019 Final Rule under Section 706 of the APA. They argue that the 2019 Final Rule (1) conflicts with the text and purpose of IRC § 170, and therefore exceeds the IRS's statutory authority; and (2) is arbitrary, capricious, or otherwise not in accordance with law. (19 Civ. 6642, Dkt. No. 58 (Pltf. Br.) at 31; 19 Civ. 6654, Dkt. No. 47 (Pltf. Br.) at 30)

### 1.   Whether the 2019 Final Rule Exceeds the IRS's Statutory Authority

In determining whether an agency has exceeded its statutory authority in promulgating a rule or regulation, courts apply the two-step analysis set forth in <u>Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.</u>, 467 U.S. 837, 842-43 (1984). <u>See Nat. Res. Def. Council v. Abraham</u>, 355 F.3d 179, 198 (2d Cir. 2004).

Under <u>Chevron</u>, courts defer to an agency's reasonable interpretation of an ambiguous statute that the agency administers. <u>Chevron</u>, 467 U.S. at 844. The IRS is generally entitled to <u>Chevron</u> deference on judicial review of its interpretations of the Code. <u>See Mayo Foundation for Medical Education & Research v. United States</u>, 562 U.S. 44, 44 (2011) (citing 26 U.S.C. § 7805(a)).

At Chevron Step One, a court asks "whether Congress has directly spoken to the precise question at issue." Chevron, 467 U.S. at 842. If so, "that is the end of the matter," for courts "must give effect to the unambiguously expressed intent of Congress." Id. at 842-43.

If Congress is "silent or ambiguous with respect to the specific issue," id. at 843, a court may "look to 'structure, purpose, and history' to determine whether these construction devices can convincingly resolve [a textual] ambiguity at Chevron [S]tep [O]ne. . . . A high level of clarity is necessary to resolve textual ambiguity in this manner." Cohen v. JP Morgan Chase & Co., 498 F.3d 111, 120 (2d Cir. 2007) (quoting General Dynamics Land Sys., Inc. v. Cline, 540 U.S. at 581, 600 (2004)).

Absent that level of clarity, the court must proceed to Chevron Step Two, where "the question . . . is whether the agency's [interpretation] is based on a permissible construction of the statute [in question]." Chevron, 467 U.S. at 843. A "permissible construction" is "'a reasonable policy choice for the agency to make'" and "supported by a reasoned explanation." Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency, 846 F.3d 492, 507 (2d Cir. 2017) (quoting National Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 986 (2005) ("Brand X")). A "permissible construction" does not include a construction that is "'inconsistent with the design and structure of the statute as a whole,'" Natural Resources Defense Council, Inc. v. Env't Prot. Agency, 961 F.3d 160, 172 (2d Cir. 2020) (quoting Utility Air Regulatory Group. v. Env't Prot. Agency, 573 U.S. 302, 321 (2014)), or that is "'arbitrary, capricious, or manifestly contrary to the statute," Catskill Mountains, 846 F.3d at 507 (quoting Chevron, 467 U.S. at 844). Chevron Step Two analysis and arbitrary and capricious analysis "provide for related but distinct standards for reviewing rules promulgated by administrative agencies." Id. at 521-22 (collecting cases).

a.      **Chevron Step One**

At Chevron Step One, this Court must consider whether Congress has clearly and unambiguously spoken to the precise "question at issue" – here, whether a taxpayer may deduct as charitable contributions under IRC § 170(a) payments made to a state or local governmental unit in exchange for tax credits.  In making this determination, the Court "must look 'to the particular statutory language at issue, as well as the language and design of the statute as a whole, and, where appropriate, its legislative history.' . . . If these indicators demonstrate that Congress has spoken to the question at issue, 'the [C]ourt, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'"  Natural Resources Defense Council v. Abraham, 355 F.3d 179, 198-99 (2d Cir. 2004) (quoting Chevron, 467 U.S. at 842-43).

As an initial matter, although the 2017 Tax Act caps SALT deductions at $10,000, it does not speak to Plaintiffs' efforts to circumvent that restriction through the device of programs by which charitable contributions made to state and local governmental units are exchanged for state tax credits, and then listed on the taxpayer's federal income tax return as charitable deductions.

As discussed above, IRC § 170 permits taxpayers who itemize deductions to deduct "any charitable contribution."  26 U.S.C. § 170(a).  The term "charitable contribution" is defined as a "contribution or gift to or for the use of[, inter alia,] . . . [a] State . . . or any political subdivision."  Id. § 170(c)(1).  IRC § 170 does not define "gift," or "contribution," however, nor does it address whether contributions made to a state or local governmental unit in exchange for a state or local tax credit are deductible as charitable contributions for purposes of the Code.

The Court next considers whether the "'structure, purpose, and history'" of IRC § 170 "convincingly resolve" the issue of whether charitable contributions made to state or local

governmental units in exchange for tax credits may be deducted on a federal income tax return. Cohen, 498 F.3d at 120 (quoting General Dynamics, 540 U.S. at 581, 600).

The charitable contribution deduction was first enacted as part of the War Revenue Act of 1917, ch. 63, § 1201(2), 40 Stat. 300, 330 (1917).  Congress levied taxes on individual taxpayers with the highest incomes in order to obtain funding to support the war effort during World War I.  55 Cong. Rec. 6728-30 (1917) (statement of Sen. Henry F. Hollis).  It was in this context that Congress added a provision to the War Revenue Act stating that "[c]ontributions or gifts" to certain charitable "corporations or associations . . . shall be allowable as deductions" pursuant to "rules and regulations prescribed by the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury."  Revenue Act of 1917, ch. 63, § 1201(2), 40 Stat. at 330.  The amendment was prompted by Congress's concern that the tax "increase [mandated by the War Revenue Act] would reduce individuals' income 'surplus' from which they supported charity.  It was thought that a decrease in private support would create an increased need for public support and even higher [income tax] rates, so that deduction was offered as a compromise."  Joint Committee on Taxation, Present Law and Background Relating to the Federal Tax Treatment of Charitable Contributions, JCX-55-11, at 4 (Oct. 14, 2011).

In 1938, the House Committee on Ways and Means articulated the following rationale for charitable deductions:

> The exemption from taxation of money or property devoted to charitable and other purposes is based upon the theory that the Government is compensated for the loss of revenue by its relief from financial burdens which would otherwise have to be met by appropriations from other public funds, and by the benefits resulting from the promotion of general welfare.

H.R. Rep. No. 1860, 75th Cong., 3d Sess. 19 (1938).  In this fashion, the Internal Revenue Code seeks to preserve the federal Government's revenue, while "encourage[ing] the development of private institutions that serve a useful public purpose."  Bob Jones University, 461 U.S. at 588.

As to legislative history concerning the terms "contribution" and "gift," the Supreme Court has observed that legislative history concerning the use of these words in the Code is "sparse." Hernandez v. Commissioner, 490 U.S. 680, 690 (1989); see also Commissioner v. Duberstein, 363 U.S. 278, 284 (1960) ("Specific and illuminating legislative history on the [word 'gift'] does not appear to exist."; "The meaning of the statutory term ['gift'] has been shaped largely by the decisional law.").

In Hernandez, the Supreme Court considered whether taxpayers should be permitted to deduct contributions made to the Church of Scientology in exchange for certain services known as "auditing" and "training." Hernandez, 490 U.S. at 684. "Auditing" in Scientology involves a Church official counseling a participant (known as a "preclear") in a one-on-one session. Id. "Training" involves courses the Church offers to participants studying the tenets of Scientology in order to become an auditor. Id. In exchange for providing these services, the Church charged participants a "fixed contribution" or "price." Id. at 685. In concluding that payments made for these services were not deductible as charitable contributions, the Hernandez court found that the legislative history of IRC § 170 "reveals [that] Congress intended to differentiate between unrequited payments to qualified recipients and payments made to such recipients in return for goods or services. Only the former were deemed deductible." Id. at 690.

The Court summarized the relevant legislative history as follows:

> The House and Senate Reports [concerning IRC § 170], for example, both define "gifts" as payments "made with no expectation of a financial return commensurate with the amount of the gift." S. Rep. No. 1622, 83d Cong., 2d Sess., 196 (1954); H.R. Rep. No. 1337, 83d Cong., 2d Sess., A44 (1954), U.S. Code Cong. & Admin. News 1954, pp. 4017, 4180, 4831. Using payments to hospitals as an example, both Reports state that the gift characterization should not apply to "a payment by an individual to a hospital in consideration of a binding obligation to provide medical treatment for the individual's employees. It

would apply only if there were no expectation of any quid pro quo from the hospital." S. Rep. No. 1622, [] at 196 (emphasis added); H. Rep. No. 1337, [] at A44, U.S. Code Cong. & Admin. News 1954, pp. 4180, 4831.

Id.

The Supreme Court addressed the same legislative history in U.S. v. American Bar Endowment, 477 U.S. 105 (1986). In that case, a tax exempt organization sold group insurance policies to its members in exchange for premium payments. Sale of the policies yielded a profit, which the organization refunded to its members. The members were required to return the refund to the organization, but the members listed it as a charitable deduction on their federal income tax returns. Id. at 107-09. In rejecting the members' argument that the charitable deduction was properly taken, the American Bar Endowment court cited the legislative history discussed above, and stressed that "[a] payment of money generally cannot constitute a charitable contribution if the contributor expects a substantial benefit in return." Id. at 116-17 (citing S. Rep. No. 1622, 83d Cong., 2d Sess., 196 (1954), U.S. Code Cong. & Admin. News 1954, p. 4629).[12]

Plaintiffs argue, however, that a state or local tax credit is not the type of benefit that constitutes a prohibited quid pro quo. According to Plaintiffs, state and local governments, like the federal government, are free to provide tax benefits – whether credits or deductions – in

---

[12] The court went on to consider the extent to which payments that bear the "dual character" of a benefit and a contribution are deductible under Section 170, adopting the two-part test promulgated by the IRS in Revenue Ruling 67-246:

> First, the payment is deductible only if and to the extent it exceeds the market value of the benefit received. Second, the excess payment must be "made with the intention of making a gift."

American Bar Endowment, 477 U.S. at 117 (quoting Rev. Rul. 67-246, 1967-2 Cum. Bull. 104, 105 (1967)). Thus, "[a] taxpayer may . . . claim a deduction for the difference between a payment to a charitable organization and the market value of the benefit received in return." Id.

exchange for charitable contributions. In Plaintiffs' view, Congress did not distinguish in IRC
§ 170 between the "financial benefits that flow from" federal and state tax benefits. (19 Civ.
6642, Dkt. No. 58 (Pltf. Br.) at 36-37) Indeed, since the first version of the charitable
contribution deduction was enacted in the Revenue Act of 1917, "donors have never been
required to reduce their charitable deduction by the amount of federal, state, or local tax
incentive received." (19 Civ. 6654, Dkt. No. 47 (Pltf. Br.) at 34) According to Plaintiffs, IRC
§ 170 "represents a policy choice by Congress to forgo additional tax revenue in order to
promote charitable giving" (id.), and the 2019 Final Rule subverts the primary purpose of IRC
§ 170 by disincentivizing donations to charitable organizations. (Id.; see also id. at 43-44
(arguing that Congress "encourage[d] charitable contributions through tax incentives; it did not
intend to prohibit them") (emphasis omitted))

Nothing in IRC § 170 suggests, however, that Congress intended that charitable
contributions made to state or local government sponsored funds – in exchange for tax credits –
would be exempt from the standard rule that the amount of a federal charitable contribution is
reduced by the amount of the benefit received.

And while the broad purpose of IRC § 170 is to encourage charitable
contributions to certain organizations, "'no law pursues its purpose at all costs.'" Catskill
Mountains, 846 F.3d at 514 (quoting Rapanos v. United States, 547 U.S. 715, 752 (2006)).
Indeed, the competing values that animate IRC § 170 are reflected in the limitations that
Congress imposed in defining the sort of contributions that constitute deductible "charitable
contribution[s]." 26 U.S.C. § 170(c)(1); see Rapanos, 547 U.S. at 753 (noting that "the textual
limitations upon a law's scope are no less a part of its 'purpose' than its substantive
authorizations"). And Congress was well aware that regulation would be necessary to further

refine the scope of contributions that could be deducted as charitable contributions, and delegated authority to the Secretary of the Treasury to promulgate those regulations.  26 U.S.C. § 170(a)(1) (permitting charitable contributions to be deducted "only if verified under regulations prescribed by the Secretary" of the Treasury); Revenue Act of 1917, ch. 63, § 1201(2), 40 Stat. at 330 (permitting charitable contributions to be deducted "only . . . with the approval of the Secretary of the Treasury").

Plaintiffs argue, however, that when Congress enacted the 2017 Tax Act, it had an opportunity to "amend[] Section 170 to reduce the charitable deduction by [state] tax incentives if it had intended that result."  (19 Civ. 6654, Dkt. No. 47 (Pltf. Br.) at 34) (citing Mobil Cerro Negro, Ltd. V. Bolivarian Republic of Venez, 863 F.3d 96, 114 (2d Cir. 2017))  According to Plaintiffs, if Congress had intended the quid pro quo principle to be applied to state or local tax credits, it would have amended IRC § 170 to so state.

But this is not a situation where Congress had "ample opportunity to amend the Code if it disagreed with [the state and local tax credit programs]."  Est. of Levine, 526 F.2d 717, 722 (2d Cir. 1975).  It was not until after the 2017 Tax Act became effective that states and municipalities created their tax credit programs.  (See 19 Civ. 6642, Dkt. No. 58-2 (Pltf. Br., Ex. B) (Palladino Decl.) ¶ 10 ("[New York's] Charitable Gifts Trust Fund was established on April 12, 2019."); 19 Civ. 6654, Dkt. No. 47-1 (Pltf. Br., Ex. A) (McClure Decl.) ¶ 6 (describing "the charitable gift reserve fund opened by the Village [of Scarsdale] in or about May 2018")); id., Dkt. No. 58-3 (Pltf. Br., Ex. C) (Dafis Decl.) ¶ 3 ("After the SALT cap was instituted, my colleagues and I began exploring a charitable tax credit program as a legal remedy for Maplewood[, New Jersey] taxpayers."))  In short, the 2019 Final Rule was the Government's

response to "efforts by states and taxpayers to devise alternate means for deducting the disallowed portion of their state and local taxes."  2019 Final Rule, 84 Fed. Reg. at 27514.

Given these circumstances, and Congress's delegation of interpretive authority to Treasury, the 2019 Final Rule is not foreclosed by Congress's failure to address Plaintiffs' tax credit programs.

The Court concludes that the Internal Revenue Code does not clearly and unambiguously address the specific question of whether contributions made to state and local governmental units in exchange for tax credits are "charitable contributions" within the meaning of IRC § 170, and therefore fully deductible.  See Cohen, 498 F.3d at 120-21 (requiring a "high level of clarity" to resolve textual ambiguity at Chevron Step One).

### b.      Chevron Step Two

Because IRC § 170 is silent as to whether contributions made to state and local governmental units in exchange for tax credits are "charitable contributions" within the meaning of the statute, the Court must proceed to Chevron Step Two and determine whether IRS's interpretation of "contribution or gift" is "based on a permissible construction of the statute." Chevron, 467 U.S. at 843.

The Internal Revenue Code grants the "Secretary [of the Treasury]" authority to "prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue."  26 U.S.C. § 7805(a).  And the Supreme Court "has long recognized the primary authority of the IRS and its predecessors in construing the Internal Revenue Code," as well as the agency's "continuing duty to interpret and apply the Internal Revenue Code."  Bob Jones University, 461 U.S. at 596, 597 (collecting cases); see id. at 596 ("In an area as complex as the

tax system, the agency Congress vests with administrative responsibility must be able to exercise its authority to meet changing conditions and new problems.").

Moreover, "'a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps.'" Natural Resources Defense Council, 961 F.3d at 170 (quoting Catskill Mountains, 846 F.3d at 520).  Given these circumstances, the IRS's interpretation "must only be reasonable"; it "need not be the sole permissible or even most reasonable interpretation of the statute." Id.

### i. The IRS's Justification for the 2019 Final Rule

In the 2019 Final Rule, and over nineteen Federal Register pages, the IRS provides several justifications for the new regulation, including (1) the text of IRC § 170(a) and Supreme Court case law interpreting the term "charitable contribution"; (2) strategies employed by taxpayers to circumvent the cap on SALT deductions mandated in the 2017 Tax Act; and (3) tax policy considerations, including the need to preserve significant revenue that would be lost if state or local tax credits received in exchange for charitable contributions were ignored in determining the propriety of a charitable contribution deduction.

The IRS begins its analysis with the language of IRC § 170(a), which authorizes an itemized deduction for any "charitable contribution" paid within the relevant tax year.  IRC § 170(c) defines "'charitable contribution'" as a "'contribution or gift to or for the use of' any entity described in that section."  2019 Final Rule, 84 Fed. Reg. at 27513 (quoting IRC § 170(a)(1)).  Section 170(c) entities include "a State . . . or any political subdivision."  Id. (citing IRC §§ 170(c)(1), 170(c)(2)).  "A contribution or gift for . . . purpose[s] [of IRC § 170] is a voluntary transfer of money or property without the receipt of adequate consideration, made with charitable intent."  Id. at 27513, 27515.

As to the meaning of "charitable contribution," the IRS also cites Supreme Court case law explaining that the "sine qua non" of the term "charitable contribution" "is a transfer of money or property without adequate consideration.  The taxpayer, therefore, must at a minimum demonstrate that he [or she] purposely contributed money or property in excess of the value of any benefit [the taxpayer] received in return."  American Bar Endowment, 477 U.S. at 118; Hernandez, 490 U.S. at 691 (citing American Bar Endowment for the same proposition); see also 2019 Final Rule, 84 Fed. Reg. at 27513, 27518 (noting that under Supreme Court case law "a payment is not a charitable contribution if the donor expects to receive a substantial benefit in return").

Consistent with Supreme Court precedent, the IRS states that it has always maintained that a "charitable deduction" must be offset by any "return benefit" received for "a payment or transfer to an entity described in [S]ection 170(c)."  2019 Final Rule, 84 Fed. Reg. at 27514-15.  The IRS refers to this well settled doctrine as the "quid pro quo principle."  Id. at 27513.  In accordance with the quid pro quo principle and "the most logical and consistent application of existing law," the IRS states that it "do[es] not believe it is appropriate to categorically exempt state or local tax benefits from the normal rules that apply to other benefits received or expected to be received by a taxpayer in exchange for a contribution."  Id. at 27515, 27518; see also id. at 27515 (asserting that "[t]he final regulation[] [is] consistent with longstanding principles under [S]ection 170 and sound tax policy").

The IRS's second justification for the 2019 Final Rule – and what it describes as the "impetus" for the Rule – is the "response" to the 2017 Tax Act's SALT deduction cap of $10,000.  Id.; see 26 U.S.C. § 164(b)(6).  According to the IRS, the response from certain states and municipalities to the 2017 Tax Act was to "devise alternate means" to subvert the SALT

deduction cap.  2019 Final Rule, 84 Fed. Reg. at 27514-15, 27523.  "[S]ome taxpayers" – with

the aid of their state and municipal governments – sought "to pursue tax planning strategies with

the goal of avoiding or mitigating the [$10,000] limitation." Id. at 27514.  Certain states and

municipalities initiated "programs intended to work around the new limitation" by authorizing

taxpayers "to characterize payments as fully deductible charitable contributions for federal

income tax purposes, while using the same payments to satisfy their state tax liabilities." Id. at

27514, 27516.  These taxpayers sought the dual benefits of a SALT credit for purposes of their

state and local tax returns, as well as a federal charitable contribution deduction for purposes of

their federal income tax return.  Given these developments, the IRS states that it is necessary "to

clarify the relationship between the federal charitable contribution deduction under [S]ection 170

and the recently-enacted SALT limitation," id. at 27523, and to issue a new regulation stating

that where a taxpayer makes a contribution "to or for the use of an entity described in [S]ection

170(c), the amount of the taxpayer's charitable contribution deduction under [S]ection 170(a) is

reduced by the amount of any state or local tax credit that the taxpayer receives or expects to

receive in consideration for the taxpayer's payment or transfer." Id. at 27530; see also id. at

27514 (same).

      The IRS also states that the 2019 Final Rule is necessary to balance "the purpose

of [S]ection 170 . . . with the [S]ection 164(b)(6) limitation," and in light of "important tax

policy considerations." Id. at 27515-16.  As a "rough upper bound of the potential revenue loss

. . . at stake in this rulemaking," the 2019 Final Rule cites to the Joint Committee on Taxation's

estimate that the 2017 Tax Act, along with certain other tax reforms, "would raise $668 billion

over ten years." Id. at 27523 (citing Joint Committee on Taxation, Estimated Budget Effects of

the Conference Agreement for H.R. 1, The "Tax Cuts and Jobs Act," JCX-67-17 (Dec. 18,

2017)).  The IRS states that "[a] substantial amount of this revenue would be lost if state tax benefits received in exchange for charitable contributions were ignored in determining the charitable contribution deduction."  Id.; see also id. at 27516 (noting that, absent the 2019 Final Rule, taxpayers' use of state and local tax credit programs "would result in significant federal tax revenue losses that would undermine the limitation on the deduction for state and local taxes in [S]ection 164(b)(6)"); id. at 27523 ("Disregarding the value of state and local tax credits received or expected to receive in return for charitable contributions would precipitate revenue losses that would undermine the limitation on the deduction for state and local taxes adopted by Congress under the Act.").

The Court concludes that, under "Chevron's rather minimal requirement," see Catskill Mountains, 846 F.3d at 524, the IRS has provided a reasoned explanation for its promulgation of the 2019 Final Rule and its determination that taxpayers should be required to subtract – for purposes of their federal charitable contribution deduction – the value of any tax credits received from state or local governmental units to which they made their contributions. The Court further concludes that – given the 2017 Tax Act and the steps taken by states and municipalities to undermine the SALT deduction limitation – the IRS's construction of IRC §170 was "a reasonable policy choice."  Chevron, 467 U.S. at 845.

Because the IRS's interpretation of IRC § 170 is "supported by a reasoned explanation," and because "the construction [adopted by the IRS] is a reasonable policy" for the IRS to pursue, the Court will accord deference to the IRS's interpretation of the statute. Catskill Mountains, 846 F.3d at 507-08 (internal citation and quotation marks omitted).

> ii.     **Plaintiffs' Arguments as to Why the 2019 Final Rule**
>        **Is Not a Reasonable Interpretation of IRC § 170**

Plaintiffs argue that the 2019 Final Rule does not constitute a reasonable interpretation of IRC § 170 because the IRS (1) deviated from its prior policy; and (2) drew unreasonable distinctions between different tax benefits.

> a.     **Deviation from Prior Policy**

According to Plaintiffs, the 2019 Final Rule represents an unexplained "depart[ure] from existing policy." (19 Civ. 6654, Dkt. No. 47 (Pltf. Br.) at 51)  Plaintiffs point to prior guidance issued by the IRS, including a 2010 memorandum issued by its Chief Counsel, that did not "treat[] the receipt of [state and local tax] benefits as consideration that diminishes the amount of a charitable deduction."  (<u>Id.</u> at 51-52)  Plaintiffs further complain that "[n]owhere in the preamble to the Proposed Rule or the Final Rule does the IRS acknowledge that it is changing existing policy."  (<u>Id.</u> at 51)

While an agency may change its policy position, it must "display awareness that it <u>is</u> changing position" and "show that there are good reasons for the new policy."  <u>FCC v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 515 (2009) (emphasis in original).  If the agency "adequately explains the reasons for a reversal of policy, 'change is not invalidating, since the whole point of <u>Chevron</u> is to leave the discretion provided by the ambiguities of a statute with the implementing agency,'" <u>Brand X</u>, 545 U.S. at 981 (quoting <u>Smiley v. Citibank (South Dakota), N.A.</u>, 517 U.S. 735, 742 (1996)), and to allow the agency to "'consider varying interpretations and the wisdom of its policy on a continuing basis,'" for example, "in response to changed factual circumstances."  <u>Id.</u> (quoting <u>Chevron</u>, 467 U.S. at 863-64); <u>see also</u> 26 U.S.C. § 7805(a) (authorizing the IRS to "prescribe . . . all rules and regulations as may be necessary by reason of any alteration of the law in relation to internal revenue").

Here, the IRS expressly acknowledges in the 2019 Final Rule that its Chief Counsel – in a 2010 memorandum – had "advised that, under certain circumstances, a taxpayer may take a deduction under [S]ection 170 for the full amount of a contribution made in exchange for a state tax credit, without subtracting the value of the credit received in return." 2019 Final Rule, 84 Fed. Reg. at 27514; see also IRS Chief Counsel Advice No. 201105010 (Oct. 27, 2010), at 4 (the "2010 Counsel Advice") (stating that "generally" a "state or local tax benefit is treated for federal tax purposes as a reduction or potential reduction in tax liability," and "not as consideration that might constitute a quid pro quo, for purposes of [Section] 170").[13] The IRS likewise acknowledges that the 2019 Final Rule "reject[s] the 2010 [Chief Counsel Advice] conclusion." 2019 Final Rule, 84 Fed. Reg. at 27516; see also id. ("The Treasury Department and the IRS acknowledge that the proposed and final regulations depart from the conclusion of the 2010 [Chief Counsel Advice] in important respects.").

In concluding that the 2010 Counsel Advice was no longer persuasive, the 2019 Final Rule points to the 2017 Tax Act – which limits taxpayer's SALT deduction to $10,000 – and to new tax credit programs created by states and municipalities that were "intended to work around the new limitation." Id. at 27514. The 2019 Final Rule explains that, given these developments, and "[u]pon reviewing the authorities under [S]ection 170, the Treasury Department and the IRS questioned the reasoning of the 2010 [Chief Counsel Advice]," and

---

[13] The 2019 Final Rule explains that "[a]lthough [Chief Counsel Advice memoranda] are released to the public under [26 U.S.C. §] 6110, they are not official rulings or positions of the IRS, and cannot be cited as precedent." 2019 Final Rule, 84 Fed. Reg. at 27516 (citing 26 U.S.C. § 6110(k)(3) ("Unless the Secretary otherwise establishes by regulations, a written determination may not be used or cited as precedent."); and id. § 6110(b)(1)(A) (defining "written determination" as, inter alia, "Chief Counsel advice")). Here, the Chief Counsel Advice memorandum at issue states that it "may not be used or cited as precedent." IRS Chief Counsel Advice No. 201105010 (Oct. 27, 2010), at 1.

proposed a new regulation "intended to clarify the relationship between the federal charitable contribution deduction under [S]ection 170 and the recently-enacted SALT limitation." Id. at 27514, 27523.

The IRS then provided "good reasons" for its determination that taxpayers should be required to subtract from their federal charitable contribution deduction the value of any state or local tax credit they had received in exchange for their contribution. As discussed above, the IRS justified its new regulation as furthering Congress's intent that (1) only "charitable contributions" be deducted pursuant to IRC § 170; and (2) the limitation on SALT deductions mandated in the 2017 Tax Act not be circumvented. Id. at 27514-17.

The 2010 Counsel Advice – issued long before the 2017 Tax Act that sharply limits SALT deductions on federal income tax returns and led to the state and local tax credit programs designed to circumvent that limitation – "assumed that after the taxpayer applied the state or local tax credit to reduce the taxpayer's state or local tax liability, the taxpayer would receive a smaller deduction for state and local taxes under [S]ection 164." Id. at 27516. That, of course, would frequently not be the case after passage of the 2017 Tax Act and its limitation on SALT deductions, as the 2019 Final Rule points out. Id. ("With the enactment of [S]ection 164(b)(6) [capping SALT deductions at $10,000, the 2010 Chief Counsel Advice's] assumption no longer holds true for the vast majority of taxpayers.").

Moreover, the 2010 Counsel Advice left open the possibility that "[t]here may be unusual circumstances [in the future] in which it would be appropriate to recharacterize a payment of cash or property as a reduction or potential reduction in tax liability." IRS Chief Counsel Advice No. 201105010 (Oct. 27, 2010), at 4; see also 2018 Proposed Rule, 83 Fed. Reg. at 43564 (quoting the 2010 Chief Counsel Advice for the same proposition). Such "unusual

circumstances" arose in the form of (1) the 2017 Tax Act,[14] which capped SALT deductions at

$10,000; and (2) the state and local tax credit programs instituted after the 2017 Tax Act, which

in effect allowed taxpayers to pay their state and local taxes in the form of charitable

contributions.  See 2019 Final Rule, 84 Fed. Reg. at 27515-16.

      Before the 2017 Tax Act, IRC § 164 "generally allowed an itemized deduction –

unlimited in amount – for the payment of state and local taxes."  2018 Proposed Rule, 83 Fed.

Reg. at 43564.  Because "a deduction was likely to be available under either [S]ection 164 or

[S]ection 170," "[p]ermitting a charitable contribution deduction for a transfer made in exchange

for a state or local tax credit generally had no effect on federal income tax liability because any

increased deduction under [S]ection 170 would be offset by a decreased deduction under

[S]ection 164."  Id.  Accordingly, prior to the 2017 Tax Act, neither Congress nor the agencies

distinguished between state and federal tax benefits, because "transfers pursuant to state tax

credit programs had little practical consequence from a federal income tax perspective."  Id.;

2019 Final Rule, 84 Fed. Reg. at 27515 ("Prior to the enactment of [the 2017 Tax Act], the

proper treatment of [contributions made in exchange for SALT credits] was of limited

significance from a federal revenue perspective and tax administration perspective and was

therefore never addressed in formal guidance.").

      After passage of the 2017 Tax Act, however, "treating a transfer pursuant to a

state or local tax credit program as a charitable contribution for federal income tax purposes may

---

[14]  Courts have acknowledged that the 2017 Tax Act had an unprecedented impact on this
nation's tax regime.  See New York v. Yellen, 15 F.4th 569, 574 (2d Cir. 2021) ("Congress took
a sharp turn in passing the [2017 Tax] Act."); State of New York v. Mnuchin, 408 F. Supp. 3d
399, 402, 415 (S.D.N.Y. 2019) (characterizing the new SALT deduction cap as a "novel step"
and "in some ways unprecedented").

reduce a taxpayer's federal income tax liability."  2018 Proposed Rule, 83 Fed. Reg. at 43564.

Indeed, for the majority of taxpayers who reside in Plaintiffs' states and municipalities,

> a charitable contribution deduction under [S]ection 170 would no longer be offset
> by a reduction in the taxpayer's state and local tax deduction under [S]ection 164.
> Thus, as a consequence, state and local tax credit programs now give taxpayers a
> potential means to circumvent the $10,000 limitation in [S]ection 164(b)(6) by
> substituting an increased charitable contribution deduction for a disallowed state
> and local tax deduction.

Id.; see also 2019 Final Rule, 84 Fed. Reg. at 27516.

The Court concludes that in the 2019 Final Rule the IRS adequately explains its

reasons for the change in policy, which was a "response to changed factual circumstances."

Brand X, 545 U.S. at 981.

### b.    Distinctions Between Tax Benefits

Plaintiffs do not dispute the reasoning underlying the Government's quid pro quo

assertion.  They instead complain that the IRS "selectively treats certain tax incentives as a

disqualifying 'benefit' but completely ignores other tax incentives."  (19 Civ. 6654, Dkt. No. 47

(Pltf. Br.) at 39-40)  According to Plaintiffs, while federal deductions, state deductions, and state

credits "may differ in specifics, the essential character of each incentive is the same:  each

provides a potential reduction of a donor's tax obligation to reduce the true cost of that

contribution in order to encourage charitable giving."  (Id. at 40; see also 19 Civ. 6642, Dkt. No.

58 (Pltf. Br.) at 38-43)

According to Plaintiffs, if the federal charitable contribution deduction does not

constitute a return benefit for a contribution, then a state or local tax benefit likewise cannot

constitute a return benefit.  (19 Civ. 6642, Dkt. No. 58 (Pltf. Br.) at 33-38 (citing, inter alia,

Browning v. Commissioner, 109 T.C. 303, 325 (1997) ("None of the tax consequences enjoyed

by [a charitable contribution] constitutes consideration."); McLennan v. United States, 24 Cl. Ct.

102, 106 n.8 (1991) ("[A] donation of property for the exclusive purpose of receiving a tax deduction does not vitiate the charitable nature of the contribution."), aff'd, 994 F.2d 839 (Fed. Cir. 1993))  Plaintiffs further argue that "since tax credits do not represent [monetary] value for purposes of calculating gross income," state tax credits "logically do not constitute a 'return benefit' under Section 170."  (Id. at 33-34 (citing Randall v. Loftsgaarden, 478 U.S. 647, 657 (1986) ("The 'receipt' of tax deductions or credits is not itself a taxable event, for the [taxpayer] has received no money or other 'income' within the meaning of the Internal Revenue Code."))

 The Government reads IRC § 170 differently.  If a taxpayer receives a state or local tax credit in return for contributions to a state or local tax credit program, the tax credit is not treated as the basis for a federal income tax deduction, but instead as a benefit received from the state or municipality in exchange for the contribution to its tax credit program.  (See 2019 Final Rule, 84 Fed. Reg. at 27514-15; 19 Civ. 6642, Dkt. No. 61 (Govt. Reply) at 30-31)

 In determining whether a contribution is a "charitable contribution" or a "quid pro quo," the Second Circuit considers whether the benefit would "come from the recipient of the gift."  Scheidelman v. Commissioner, 682 F.3d 189, 200 (2d Cir. 2012); see also Hernandez, 490 U.S. at 690-91 (examining the "external features of a transaction," thereby "obviating the need for the IRS to conduct imprecise inquiries into the motivations of individual taxpayers").

 For example, in Scheidelman, the court found that the charity did not give a donor any "goods or services, or benefit, or anything of value" in exchange for her cash donation, and therefore her donation "would not be a quid pro quo."  Scheidelman, 682 F.3d at 200 (internal quotation marks omitted).  The Second Circuit rejected the argument that a federal tax deduction is a return benefit, because the benefit "derive[d]" from the "deductibility of the gift on [the donor's] income taxes" would come from "elsewhere," and not from the charity.  Id.

Here, of course, the opposite is true:  the benefit – i.e., the tax credit – came from the recipient of the taxpayer's contribution.

The Court concludes that it was reasonable for the IRS to find that "the [state or local tax] credit constitutes a return benefit" from the state or municipality "to the taxpayer," "or [a] quid pro quo . . . reduc[ing] the taxpayer's charitable contribution deduction."  2019 Final Rule, 84 Fed. Reg. at 27514.

Plaintiffs also contend that the 2019 Final Rule draws an unreasonable distinction between state tax credits and state tax deductions.  (19 Civ. 6642, Dkt. No. 58 (Pltf. Br.) at 38-43)  "The problem with [the Government's] approach is that credits and deductions serve the same purpose and operate in the same way," that is, "they promote charitable giving by promising taxpayers a diminution in their individual tax liability."  (Id. at 38-39)

In response to comments concerning the 2018 Proposed Rule, the 2019 Final Rule explains that "tax policy" and "sound tax administrati[ve]" practicalities justify different treatment for state tax credits and state tax deductions.  2019 Final Rule, 84 Fed. Reg. at 27520.  As to tax policy, unlike a state or local tax credit – which reduces the amount otherwise owed dollar for dollar (see 19 Civ. 6642, Dkt. No. 58-1 (Pltf. Br., Ex. A) (Rodolakis Decl.) ¶¶ 8-10), the value of a state or local tax deduction is "based on a taxpayer's state and local marginal rate."  2019 Final Rule, 84 Fed. Reg. at 27520.  Accordingly, the value of a state or local tax deduction for a taxpayer is a small fraction of the "economic benefit" that a tax credit provides.  Id.  As a result, "the risk of a taxpayer using [a state or local tax] deduction[] to circumvent [the 2017 Tax Act], and the potential revenue loss, is comparatively low."  Accordingly, the "quid pro quo principles [that apply] in the case of dollar-for-dollar [state or local tax credits]" do not apply to state or local tax deductions.  Id.

As to "administrati[ve]" practicalities, the 2019 Final Rule explains that it would be difficult for taxpayers and the IRS to accurately calculate the value of a state or local tax deduction provided in exchange for a contribution to a state or local governmental unit, because "the value of a deduction would vary based on the taxpayer's marginal [SALT] rates." Id. After weighing the limited risk that taxpayers would use a state or local tax deduction to evade the cap on SALT deductions against the "administrative complications" resulting from a determination that the value of a state or local tax deduction must be deducted from a federal charitable contribution deduction, the IRS decided to "allow taxpayers to calculate their federal tax deductions without [reducing] their dollar-for-dollar [SALT] deductions." Id. The balancing of these considerations involves the kind of "difficult policy choices that agencies are better equipped to make than courts," Brand X, 545 U.S. at 980 (citing Chevron, 467 U.S. at 865-66), and the Court concludes that the IRS made a reasonable judgment concerning this issue.

The same distinction between SALT tax credits and SALT deductions drives Plaintiffs' argument that the 2019 Final Rule's "de minimis" exception is unreasonable. The de minimis exception permits a taxpayer to deduct his or her full charitable contribution to a state or local governmental unit if the state or local tax credit that the taxpayer receives in exchange does not exceed 15 percent of the taxpayer's contribution. 2019 Final Rule, 84 Fed. Reg. at 27515. Plaintiffs contend that the 15 percent figure is arbitrary and results in an unfair "cliff effect," whereby a state or local tax credit that exceeds 15 percent by only a small amount would not receive the benefit of this exception. (19 Civ. 6642, Dkt. No. 58 (Pltf. Br.) at 44) Plaintiffs also complain that the 15 percent exception creates an "arbitrary disparity" between SALT tax credits and federal tax deductions. (Id. at 45) Plaintiffs explain that for "a donor in the top marginal federal income tax bracket," a federal tax deduction is "worth 37 percent." (Id.) "Yet a taxpayer

who receives a SALT credit worth 16 percent of a deduction must subtract its value [from the taxpayer's federal charitable contribution deduction], while a taxpayer who gets a federal tax deduction worth 37 percent need not." (Id.)

In the 2019 Final Rule, the IRS explains that it arrived at the 15 percent figure because the "combined top marginal [SALT] rates . . . currently do not exceed 15 percent." 2019 Final Rule, 84 Fed. Reg. at 27520. The IRS considered "tailoring this exception to the combined marginal [SALT] rates applicable for a taxpayer's particular jurisdiction," but "determined that using a single rate sufficient to cover the highest existing marginal rates would avoid the complexity and burden that would arise if a taxpayer had to [individually] compute [his or her marginal state and local tax rates]." Id. Using one figure – 15 percent – ensures that taxpayers are "treated similarly" across states offering SALT deductions and those offering "economically equivalent credits." Id. Given the complexity cited by the IRS, this Court cannot find that the agency's approach is unreasonable.

The Court concludes that the 2019 Final Rule constitutes a reasonable interpretation of IRC § 170 and is supported by a reasoned explanation. The Rule therefore survives deferential review under Chevron.

### 2.       Whether the 2019 Final Rule is Arbitrary and Capricious

In addition to their substantive reasonableness challenge to the 2019 Final Rule, Plaintiffs argue that the promulgation of the Final Rule was arbitrary and capricious. (19 Civ. 6642, Dkt. No. 58 (Pltf. Br.) at 31, 38-49; 19 Civ. 6654, Dkt. No. 47 (Pltf. Br.) at 40-53) While this Court has concluded that the IRS's interpretation of IRC § 170 is reasonable under Chevron, it must separately consider whether the promulgation of the 2019 Final Rule "is procedurally defective as a result of flaws in [the IRS's] decisionmaking process." Catskill Mountains, 846 F.3d at 521 (declining to incorporate the State Farm standard into Chevron Step Two analysis);

see Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mutual Automobile Ins.

Co., 463 U.S. 29 (1983) ("State Farm").

>    In State Farm, the Supreme Court explained that under APA § 706(2)(A),

> an agency rule would be arbitrary and capricious if the agency has relied on
> factors which Congress has not intended it to consider, entirely failed to consider
> an important aspect of the problem, offered an explanation for its decision that
> runs counter to the evidence before the agency, or is so implausible that it could
> not be ascribed to a difference in view or the product of agency expertise.

State Farm, 463 U.S. at 43.

>    In support of their arbitrary and capricious claim, Plaintiffs argue that – in

promulgating the 2019 Final Rule – the IRS (1) impermissibly relied on IRC § 164, "an entirely

differen[t] Code section . . . which Congress [did] not intend[] it to consider [when interpreting

IRC § 170]"; (2) did not consider the decline in charitable contributions that would result from

the 2019 Final Rule; and (3) changed its interpretation of "charitable contribution" without

adequate explanation.  (19 Civ. 6654, Dkt. No. 47 (Pltf. Br.) at 42-45, 47-53; 19 Civ. 6642, Dkt.

No. 58 (Pltf. Br.) at 38, 45-49)

>    In considering Plaintiffs' arguments, this Court is "not to substitute its judgment

for that of the agency," but is "instead to assess only whether the decision was based on a

consideration of the relevant factors and whether there has been a clear error of judgment."

Dep't of Homeland Sec. v. Regents of the Univ. of California, 140 S. Ct. 1891, 1905 (2020)

(internal citations and quotation marks omitted).

>    Plaintiffs complain that – in promulgating the 2019 Final Rule – the IRS (1)

improperly "circumvent[ed]" IRC § 170's "policy . . . of promoting charitable giving" "in favor

of" the 2017 Tax Act's policy of "rais[ing] revenue"; and (2) did not consider the decline in

charitable giving that would result from the issuance of the 2019 Final Rule.  (19 Civ. 6654, Dkt.

No. 47 (Pltf. Br.) at 43-45)  According to Plaintiffs, in enacting IRC § 170, "Congress [was]

determined to pursue its policy goal of promoting charitable giving by granting donors a tax deduction." (Id. at 43)

As discussed above, however, Congress understood both that the policy goal of promoting charitable giving must be balanced against the nation's need for revenue, and that rules and regulations regarding the IRC would require change and supplementation when the underlying Code is altered. It was for such reasons that Congress delegated to the Secretary of the Treasury the authority to "prescribe . . . all [necessary] rules and regulations" when there is "any alteration of law in relation to internal revenue." 26 U.S.C. § 7805; see id. § 170.

The 2017 Tax Act's cap on SALT deductions marked a signal change in this nation's tax regime. That change was the impetus for Plaintiffs' efforts to circumvent the new cap through the tax credit programs discussed in this opinion. In responding to these changed circumstances, the IRS was called upon to consider and balance a number of competing interests, including, inter alia, the nation's need to raise revenue; Congress's clear intent to limit SALT deductions; the desire to encourage charitable giving, as reflected in IRC § 170; the quid pro quo principle; and the administrative burdens and practicalities associated with a variety of regulatory approaches. See 2019 Final Rule, 84 Fed. Reg. at 27514-15, 27523. That is the role of an agency such as the IRS in our federal system. See City of Erie v. Pap's A.M., 529 U.S. 277, 314 (2000) (Souter, J., concurring) (plurality opinion) ("[A]gencies are part of the [E]xecutive branch and [courts] defer to them in part to allow them the freedom necessary to reconcile competing policies.") (citing Chevron, 467 U.S. at 843-45).

As to the possibility that the 2019 Final Rule would cause an "aggregate" decline in charitable contributions, the IRS addressed that possible effect in the Final Rule, but concluded that any such effect would likely be "small," citing (1) the fact that federal taxpayers

can continue to deduct  "the portion of [their] charitable contribution that is a gratuitous

transfer"; (2) "the state-level benefit provided by state tax credits"; and (3) various safe harbors

exempting C corporations and specific passthrough entities.  2019 Final Rule, 84 Fed. Reg. at

27522, 27524.  In sum, the IRS "'articulated a . . . rational connection between the facts found

and the choice made.'"  Waterkeeper All., Inc. v. Env't Prot. Agency, 399 F.3d 486, 498 (2d Cir.

2005) (quoting State Farm, 463 U.S. at 42).

   Finally, and as discussed in the Chevron analysis, the IRS considered and

addressed in the 2019 Final Rule the arguments Plaintiffs raise here, and provided reasonable

explanations for the decisions and determinations it made.[15]

   The Court concludes that IRS's promulgation of the 2019 Final Rule was not

arbitrary and capricious.

---

[15]  To the extent that Plaintiffs argue that the IRS should have issued the 2019 Final Rule under
IRC § 164 rather than IRC § 170, the Final Rule directly addresses that argument:

> Upon careful review . . . , the Treasury Department and the IRS have determined that
> longstanding principles under [S]ection 170 [and quid pro quo] should guide the tax
> treatment of [the challenged] contributions.  Section 170 provides a deduction for
> taxpayers' gratuitous payments to qualifying entities, not for transfers that result in
> receipt of valuable economic benefits.

2019 Final Rule, 84 Fed. Reg. at 27515.

## CONCLUSION

Defendants' motions to dismiss are granted in part and denied in part as set forth above.  Defendants' motions for summary judgment are granted, and Plaintiffs' motions for summary judgment are denied.

The Clerk of Court is directed to terminate the motions pending in 19 Civ. 6642 (Dkt. Nos. 57, 59) and in 19 Civ. 6654 (Dkt. Nos. 44, 46), to enter judgment for Defendants in both cases, and to close both cases.

Dated: New York, New York
       March 30, 2024

SO ORDERED.

Paul G. Gardephe
United States District Judge